GIOSEPPE GIORDANO *vs.* THE BRANDYWINE GRANITE COMPANY, a corporation of the State of Delaware.

*Case—Personal Injuries—Negligence—Fellow-Servant—Duty of Master — Evidence — Rules — Privileged Communication — Counsel and Client—Incompetency of Fellow-Workman; How Proved—General Reputation—Prior Accidents —Notice of Incompetency—Six Witnesses to One Fact—Rule of Court—Measure of Damages.*

1. Under the rule of court six witnesses only can be put upon the stand to speak upon any particular point on each side.

2. To enable a servant to hold a master liable for the misconduct of a fellow-servant, the jury must be satisfied from the preponderance of the evidence: (1) That the injury complained of was caused by the negligence of such fellow-servant. (2) That such fellow-servant was an incompetent or negligent servant. (3) That the master had actual or constructive notice of the incompetency or negligence of such servant.

3. In ascertaining whether a fellow-servant was an incompetent or negligent servant, it is proper for the jury to take into consideration the evidence of his general reputation in these respects among those with whom he worked or lived; and if that reputation was bad, it may be taken as evidence tending to show notice to the master of the incompetency or negligent character of such fellow-servant.

4. The incompetent and careless character of a fellow-servant may be proved

by evidence of prior accidents to such servant in employment similar to the present one, occasioned by his incompetence or carelessness; but no weight should be given to evidence of prior accidents unless such accidents are proved by the preponderance of the evidence to have been occasioned by the incompetence or carelessness of such servant.

5. It is the duty of the master to make and promulgate proper rules for the government of his servants and business whenever it is so large or complicated as to make his personal supervision impracticable. And this is especially so if the business is also hazardous.

6. The rule stated touching the duty of the master to give instruction and warning to the servant as to the character of new employment; and also the rule respecting the assumption of risk by the servant.

7. The measure of damages.

*(December 13, 1901.)*

LORE, C. J., and SPRUANCE and GRUBB, J. J., sitting.

*Charles B. Evans* and *J. Harvey Whiteman* for plaintiff.

*William C. Smithers* (of the Philadelphia bar) and *Henry C. Conrad* for defendant.

ACTION ON THE CASE (No. 96, November Term, 1901), to recover damages for personal injuries, resulting in the loss to the plaintiff of his nose and both eyes. It was conceded that said injuries were inflicted by a premature discharge of a blast in a stone quarry of the defendant located near Wilmington, and that at the time of the accident the plaintiff was engaged in assisting one Caparello, a blaster or powder man of the defendant, in loading or preparing said blast.

At the trial the following questions were asked the plaintiff on direct examination:

Q. Did you know anything about the business of blasting?
A. No, sir.
Q. Had you ever worked at that kind of business before you came to work for this company?

A. No, sir.

Q. Did this company ever give you any instructions about blasting?

(*Mr. Smithers*, of counsel for defendant, objected to this question.)

SPRUANCE, J.:—We think that question is admissible.

Q. Was your attention ever directed to any rules of the company (that is the Brandywine Granite Company) governing the operation of its quarries?

(Objected to upon two grounds: *first* as to form, and *second* that it is immaterial whether the defendant company had any rules posted up or not; that the count in the narr alleging lack of rules was accepted by defendant's counsel simply as an averment of lack of notice of a particular peril that led up to the injury; that the question is, did this man get notice of the peril out of which the injury grew.)

*Mr. Whiteman*, of counsel for plaintiff, contended that such testimony was perfectly proper, and had been so clearly laid down by repeated decisions of Delaware courts, citing *Rex vs. Pullman Palace Car Company, 2 Marvel, 337*, and *Murphy vs. Hughes Brothers & Bangs, 1 Pennewill, 250*.

SPRUANCE, J.:—We have a great many decisions upon that subject. It was passed upon in the case of *Wheatley vs. P., W. & B. R. R., 1 Marvel, 305*, to this extent, that among the duties of the master, as summed up by the Court, we find the following: "And it may be he should make and promulgate rules for the government of his establishment whenever it is so large or complicated as to make his personal supervision impracticable."

The only possible objection we see to the question now propounded is as to the form of it.

(Question withdrawn.)

Q. Was or was not your attention ever directed to any rules of this company governing the conduct of its business?

(Objected to.)

SPRUANCE, J.:—We think this question is admissible in the present form.

Q. Did you, or did you not, ever see any rules furnished by the defendant company in the Italian language?

(Objected to.)

SPRUANCE, J.:—The objection is overruled.  We hold that the question is a proper one.

Q. Did the Brandywine Granite Company ever furnish any rules of any kind in any way governing its employees in the conduct of its business?

(Objected to on the same grounds as before stated, and further for the reason that supposing the plaintiff was injured notwithstanding the rules and in spite of any violation of them, there is no evidence that he was injured by reason of the violation of any rules whatever, and, therefore, it is not pertinent as the case stands.)
(Objection overruled.)

Q. What particular work were you employed by the defendant company to perform?
A. When first I went to work for the Brandywine Granite Company I worked as a laborer; ran a crushing machine; afterwards I was put in the quarry to split stones with a sledge.

Q. Is or is not the work which you have mentioned in your last answer the kind of work that laborers perform in that quarry?

(Form of question objected to and objection sustained.)

Q. Was or was it not anything that came from the blast that injured you?
(Objected to as suggestive.)

SPRUANCE, J.:—We think the question is a proper one.

Q. Have or have not you been able to see anything since you were hurt on the day of that explosion?
(Objected to and objection overruled.)

Q. What person or company was operating those quarries at the time you were injured?
(Objected to, unless ground is laid for witness' knowledge; also as leading. Objection overruled.)

On cross-examination the plaintiff was asked, among others, the following questions:
Q. When you were in the office of Mr. Peter L. Cooper, in the Ford Building in this city, in the early spring of this year, did not Mr. Cooper ask you who told you to work with Caparello on the day you were hurt?
A. The lawyer asked me who sent me to work with Caparello.
Q. Did you not answer Mr. Cooper, in the presence of Louiga Di Mayo, at the time and place mentioned, by saying, " Caparello told me," or words to that effect?
(Objected to on the ground that this was an interview between the plaintiff and Mr. Cooper, who was then his counsel, and was protected as a privileged communication.)

After argument and the cititation of authorities by Mr. Smithers, plaintiff's counsel withdrew their objection and the plaintiff was allowed to answer.

*Antonio Parillo,* a witness on behalf of plaintiff, was asked by Mr. Whiteman the following question:

Q. Were or were not you ever told to fire off a small blast by Caparello when you were both employed by the Brandywine Granite Company, and Caparello shot off a large blast, close to you, without giving you notice?

*Mr. Smithers:*—I object. In the first place, it is a historical narrative suggested to the witness in the way of a question; second, it is pursuing the same line that we announced some time ago that we were against, and we have been taking exceptions along that line ever since.

GRUBB, J.:—You mean, undertaking to show incompetency by particular instances?

*Mr. Smithers:*—Yes, sir; without showing similarity between the two situations. And it is leading.

SPRUANCE, J.:—The objection is sustained. The question is overruled.

*Francisco Di Prisco,* another witness on behalf of plaintiff, was asked the following questions:

Q. Did you ever know Caparello to get hurt any times before the time he was killed, when blasting for the Brandywine Granite Company?

(Objected to by *Mr. Smithers* on the same ground as before stated, being in the same line as pursued before.)

*Mr. Whiteman:*—I am seeking now to prove the incompetency of this man Caparello, and knowledge of this defendant company, by similar acts and circumstances having taken place previously.

(*Mr. Whiteman* cites *Bailey on Master and Servant, Section 1506.*)

SPRUANCE, J.:—That does not sustain your position.    The allegation there was, negligence in turning a switch, and it seems to have been admitted that it was an improper turning of the switch. The parties were allowed to give evidence of the improper turning of the switch by the employee on former occasions, or other similar wrongful acts.    But the Court did not allow them to give evidence without regard to the cause on former occasions when he was present.

Your question would be wholly immaterial unless it is to be followed by proof that the explosions referred to in the question were occasioned by Caparello's incompetency or negligence.

Do you undertake to, or believe that you can make that proof? Of course you might be mistaken, but do you believe it?

*Mr. Whiteman:*—Yes, sir; I will undertake to do that.   I say in good faith that I believe that I can do it, and if it is not done I agree that it shall be stricken out.

SPRUANCE, J.:—You will undertake to prove that this accident to which your question refers, was occasioned by the negligence or carelessness or incompetency of Caparello, and to bring that knowledge home in the proper and lawful manner to the defendant company?

*Mr. Whiteman :*—I will undertake to do that, and if I do not succeed I will ask to have it stricken out.

SPRUANCE, J.:—The question under this statement of Mr. Whiteman is admitted.

A. Three other times he got hurt.

Q. How did he upon those occasions get hurt?

(Objected to because the question presupposes that this witness is able to tell the Court and jury the physical condition, and has sufficient expert knowledge to draw an inference for the benefit of the Court and jury.)

SPRUANCE, J.:—We are asking about the facts. He may have been present and seen the whole thing. We think the question is a proper one.

Q. Do you know the general reputation—that is, what people living and working around John Caparello said of him—as a competent, careful, painstaking blaster. Answer the question, yes or no.

(Objected to. Objection overruled.)

*Salvatori Verderame*, one of plaintiff's witnesses, was produced and was allowed to testify, against the objection of defendant's counsel, as to three accidents that happened to Caparello while blasting; the third one being the one in which he lost his life and which resulted in the injuries in question to the plaintiff. The witness was then asked by *Mr. Whiteman* the following questions:

Q. Did you know the general reputation of John Caparello; that is, what the people about him said with respect to his being a capable, careful and trustworthy blaster? Answer yes or no.

(Objected to. Objection overruled and question allowed.)

A. Yes, sir.

Q. What was that general reputation?

A. The last time he got hurt, and after he was put back to work again in the same capacity, all the people were afraid and were saying also that some day he would kill somebody there.

(*Mr. Smithers* moved to strike out the above answer upon the ground that it is hearsay.   The Court declined to strike out.)

Q. Did you ever see men about the quarry refuse to go to assist Caparello in blasting when he would ask them?

(Objected to.)

SPRUANCE, J.:—The objective point, of course, in all these questions, is to prove Caparello's want of skill, knowledge, care, etc., and we have already decided that that may be proved by individual instances of carelessness or by general reputation of carelessness or want of skillfulness.

This witness has testified as to three instances under his personal observation, which he has undertaken to describe which— the other side claim—tend to show carelessness in those particular instances.   He has followed that up by testimony of this witness as to the general reputation of Caparello for carelessness and want of skill.

Now, he asks the question, " Did you every see men about that quarry refuse to go to assist Caparello in blasting when he would ask them?"   He says if he gets an affirmative answer to that question he will follow that up by proof that these men refused to go for the reason that they were afraid to work with Caparello on account of his unskillfulness or carelessness.

*Mr. Smithers:*—He testifies instead of the man himself on that subject.

SPRUANCE, J.:—He further promises that he will show not only the fact of the refusal, but the reason of the refusal, and further he promises to show us that that was brought to the knowledge of this defendant company through its authorized agents, and that notwithstanding, those men were ordered to go with Caparello.

In the opinion of the majority of the Court, it is an eminently proper question and is admitted.

LORE, C. J. (dissenting):—In my judgment, this evidence is clearly not competent.

If it is sought to be introduced to prove reputation, it is not in accordance with any principle of law with which I am familiar.

There is a mode of proving reputation, and that is by showing what people generally say about a man in the community in which he lives.

If it is introduced for the purpose of showing imcompetency, there are two ways to show that. One is by the incompetent, unskillful conduct of the man himself, and another, which we have admitted here today, is by the general reputation for incompetency.

Now, the proof that certain men refused to work with Caparello comes under neither of these heads. It is not proof of incompetency, nor is it of general reputation as to incompetency; but it is that somebody, or a number of people, refused to work with him? Why? If it is because of what they said, it is mere hearsay. And if it is to bring home knowledge of incompetency to this company, how does it prove that? Is it general reputation? Is it any unskillful act? They are the two modes of proving incompetency.

To my mind the question is wholly inadmissible for the reasons I have stated, and I am therefore compelled to dissent.

A. It was the same old thing every day; some would not go and some would go.

Q. What would Caparello do then?

(Objected to. Objection overruled.)

A. He would refer that to the boss.

Q. What boss?

(Objected to. Objection overruled.)

A. When John Yeates was there he would refer it to him, but after John Yeates went away then he would go to Domenico Cassaro.

Q. What would these bosses do then about it?

(Objected to.   Objection overruled.)

A. When John Yeates was there he would say to the men, "Why don't you want to go and help Caparello?" The men would say, "No; I don't want to go." And then he would do this to himself (the witness indicates by violently shaking his head and tearing his hair) and curse them and say, "You go; go."

Q. What reason, if any, did the men give for not wanting to work with Caparello, if you know?

(Objected to as hearsay.)

SPRUANCE, J.:—The objection is overruled by a majority of the Court.

GRUBB, J.:—The ground on which we admit the question is that a man's competency or incompetency, unskillfulness or recklessness, may be proved in three ways at least, and maybe more. *One* is, that you prove that he is competent. *Second*, you may prove it, according to the authorities, by general reputation. *Third*, you can prove it by the conduct, the actions, etc., of those who are called upon to work with him which go to indicate whether he is unskillful or not—their actions and what they said at the time as the expression of their reasons; their mental emotions and all, for such are a part of the act itself and therefore admissible.

Of course, we understand a man's expression of his mental condition, a man's expression of his feelings and all that are not hearsay, but they are facts to be proven, when from those facts you may naturally and reasonably infer the condition of his mind or the reason for his acts.

Of course, we have taken this view as just intimated, that in addition to showing the mere fact that he is unskillful, you can show it by the feelings as manifested by the words and acts of the

people who work with him. For they manifest their opinion by their acts as well as by their language, as to what the general opinion is. In other words, his general reputation among the people with whom he works may be shown not merely by their language, but by their expressions and by their actions as well as their language.

(LORE, C. J., dissents, on the ground that such evidence is hearsay.)

*Michelle Marcello* was produced on behalf of plaintiff and was asked the usual questions as to the reputation of Caparello as a competent blaster.

(Objected to by *Mr. Smithers*, on the ground that the plaintiff had already examined six witnesses upon the particular point inquired about in the above question, and that, therefore, to allow the examination of this witness upon the same matter would be a violation of the rule of Court limiting the testimony on any one point to six witnesses.)

*Mr. Whiteman:*—As I understand the rule, it is that a fact can only be proven by six witnesses. In other words, that six witnesses only can testify as far as the establishment of a fact is concerned. Now, this is only the fourth witness, if allowed to testify, who has borne testimony upon this particular subject.

Any witness I asked as to the subject of general reputation, whether examined on any other subject or not, counts against the six. I will not dispute that proposition.

I have this to say, however, that the rule certainly does not apply to the number of witnesses to whom the question is simply addressed, but it would be to the number of witnesses who bore testimony either for or against the question.

GRUBB, J.:—We have always held uniformly, unless there is some exception such as you have mentioned, that if you choose to

interrogate the witness you take the risk, and if he says he does not know anything about it, that is one witness, for you should have informed yourself better before you asked him that question.

Suppose the other rule is adopted, what would be the result? Counsel can call them, and if they don't happen to know what he thinks they do, or if they are not satisfactory, then he can try another, and can test any number of them. You say we will stop them when we ought to. But the trouble that we have about that is that counsel in some other case comes along and cites this as a precedent.

So far as I am concerned, if you say that one of the witnesses is not the man you supposed he was, or the man you intended to interrogate, then he ought not to be counted as one of the six. If he is the man you intended to interrogate, and he does not know anything about the matter of the general reputation of Caparello, we think he ought to count against you.

LORE, C. J.:—This question was very thoroughly considered in the case of *Higgins vs. Mayor and Council*, where Mr. Vandegrift raised the point and it was argued for quite a while. He called a number of witnesses and two or three of them had answered that they did not know anything about it, and Mr. Vandegrift then stated that he had not called his best witnesses, those he expected to call, and he thought he ought to be permitted to call more than six.

After a careful and very thorough consideration the Court reaffirmed the old rule, the one we have adopted, that they would allow six witnesses only to speak upon any one particular point on each side. And if the counsel saw fit to call those who said they did not know anything about it, that was his risk, and that the time of the Court was not be consumed in sifting witnesses to find out who would answer yes or who would answer no, and that the only safe thing would be for us to adhere to the plain rule.

That if counsel elected to put six witnesses as to a certain subject upon the stand and they did not know anything about it, he

was bound by it.   That is a reasonable rule, and the majority of the Court feel that it is a right rule.

SPRUANCE, J. (dissenting):—A majority of the Court hold that Francesco di Prisco (a witness who testified that he did not know anything about the general reputation of Caparello) is to be counted as one of the witnesses upon that subject.

But I am obliged to dissent from that view.

I recognize that the convenience of the Court and jury is of very great consequence.   But, after all, the attainment of justice is of much more importance than any single man's convenience, or the convenience of any number of men.

And therefore I think we should apply this rule in such a manner as will most likely attain justice, avoiding, as far as possible, inconvenience.

To my mind, this rule has no reason in it, except this:

That a multitude of witnesses testifying as to a single point, which testimony would be merely cumulative, would be an unnecessary waste of time.   But it must be, if it means anything, intended to permit them to testify upon the point.

There can be no cumulative testimony of a man who does not testify upon the subject.

Now, this man was called and he was asked if he knew the general reputation of Caparello in respect to this particular matter. He said, in substance, " I do not."   He therefore never testified as to the character of this man one way or the other.   He simply had not the qualification.   His testimony therefore upon this subject cannot be considered cumulative at all, and he ought not to be counted.

That is my judgment about it.   It seems to me to stand upon sound principle; and I think it would be very unjust to curtail, in this particular case, the number of witnesses as to character by the addition of those who are called to the stand and asked if they had any qualification to speak upon the subject and said they had not.

So far as the other suggestion is concerned, that if you apply the rule in the manner which I suggest the Court would be greatly annoyed, I have not any fear of that for my part; and I don't think that my brethren need fear for themselves. We will take care of ourselves whenever we find that counsel are trifling with us.

If we find that counsel are calling witnesses without any knowledge—and why anybody should call a man with a knowledge that he would say that he did not know anything about the subject he would testify to, I don't know—but if anybody should be so foolish as to do that, the Court will very soon put their hand on him.

Q. What did the people say about him as a blaster?

(Objected to. Objection overruled.)

A. That nobody would go with him when they were called by him.

Q. What reason, if any, did they give for not going to work with Caparello when they were called to help him blast?

(Objected to.)

SPRUANCE, J.:—The question in its most proper form is, What is the general reputation of this man among the people with whom he lived and worked upon a particular subject; that is, what the people generally say upon that subject?

That is the question by which he qualifies himself to speak at all. He has given his answer to that and to the next question that it was bad. Now, the question is, What did those people generally say, referring to the same subject as alluded to in the first question, upon that subject?

It seems to me that it is absolutely proper and suitable; and that it would be very extraordinary, when there are several qualities—care, skill and all that sort of thing—that are involved in the

question, that the people may generally say something in regard to all or part of these qualities that have been inquired about. It seems to me that the question, if it is to be put in the shape of what people generally say, corresponds precisely to the character of the question in its original form, and is an entirely proper question.

It is true, that what people generally say, either in response to the first question or the last that I have mentioned, is made up of what individual people have said—meaning many individual people.

The question is sustained by a majority of the Court.

LORE, C. J., (dissenting):—I cannot agree with the majority of the Court, that you can prove general reputation in this way. Reputation is the aggregate or result of what people generally say, showing that this man's reputation is bad; but that the plaintiff can inquire into what was actually said by each person, to my mind is not admissible; for the reason that you cannot put in by one expression concretely what people generally say. It is made up of what individuals say. The people generally do not have one man's voice. Each one makes his own statement. General reputation may be inquired into, but what people generally say must in detail be ascertained by what each individual says, to get the volume of the aggregate judgment. This is permissible only on cross-examination.

Q. Did you ever see any of the men about the quarry refuse to go to work with Caparello in assisting him to blast, when he would ask them?

(Objected to.)

SPRUANCE, J.:—The majority of the Court sustains the question, provided he connects it.

*Mr. Smithers:*—With what?

*Mr. Whiteman:*—With the officers of the company.

SPRUANCE, J.:—No; with the grounds of refusal.

*Mr. Smithers:*—This is all in accordance with your Honors' early ruling.   I think it was indicated yesterday that all of this must be connected subsequently by showing the particular facts that would prove the negligence of this man and the knowledge of the company.

SPRUANCE, J.:—No; not at all at this stage.

GRUBB, J.:—You are seeking now, Mr. Whiteman, to show that he saw people by their conduct or actions refusing to work with Caparello ?

*Mr. Whiteman:*—That is right.

GRUBB, J.:—And that it was because of Caparello's careless-ness, recklessness, etc., that excited in their minds a reasonable apprehension of danger to them if they worked with him; thereby showing to the jury, if you can, that he was such an incompetent or reckless workman to work with, that he was unfit for his position, and you said that you afterwards would show that the company was aware that these people were afraid and refused to go, and that that was brought home to the officers of the company, who then told the men if they did not go work with him they would be discharged ; and that the company thereby had notice of their apprehension concerning this man.   ·

*Mr. Whiteman:*—Yes, sir ; the same as we have been ques-tioning all day.

SPRUANCE, J.:—A majority of the Court rule the question in.

SPRUANCE, J., charging the jury :

Gentlemen of the jury :—This action is brought to recover damages for injuries sustained by the plaintiff while an employee or servant of the defendant.

It is conceded that said injuries were inflicted by a premature discharge of a blast in a stone quarry of the defendant, and that at the time of the accident the plaintiff was engaged in assisting one Caparello, a blaster or powder man of the defendant, in loading or preparing said blast.

The ground upon which a servant recovers in an action against the master for injuries sustained in his service, is that such injuries were caused by the violation or neglect of some duty which the master owed to the servant. If there was no such duty there can be no such liability.

In other words, the ground of recovery in such an action is the negligence of the master, or the negligence of some person for whose conduct the master is responsible to the plaintiff.

The burden of proving such negligence is on the plaintiff, and it is not incumbent on the defendant to show the cause of the accident, or that it was not caused by his negligence, or the negligence of any person for whose conduct he was responsible to the plaintiff.

*Creswell vs. R. R., 2 Pennewill, 215.*

A servant cannot recover from the master for injuries caused by the negligence of a fellow-servant, in the selection and retention of whom the master has used due diligence.

It is the duty of the master to exercise ordinary care in the selection and retention of his servants, to the end that fellow-servants may not be endangered in the performance of their duties by the conduct of other servants of the defendant who are unskillful or careless in the performance of their duties.

The degree of care thus required of the master in the selection and retention of his servants is proportioned to the risk or hazard of the particular business in which the servant is engaged. The master owes to his servant the duty of employing reasonably com-

petent and careful co-workers and fellow-servants; that is to say, co-workers or fellow-servants who are reasonably competent and careful for the performance of the particular work in which they are engaged.

To enable a servant to hold a master liable for the misconduct of a fellow-servant, the jury must be satisfied from the preponderance of the evidence: (1) That the injury complained of was caused by the negligence of such fellow-servant. (2) That such fellow-servant was an incompetent or negligent servant. (3) That the master had actual or constructive notice of the incompetency or negligence of such fellow-servant.

Whether all or any of these facts have been proved is to be determined by the jury, after a careful consideration of the evidence.

In ascertaining whether a fellow-servant was an incompetent or negligent servant in the conduct of the business in which he was employed, it is proper for the jury to take into consideration the evidence of his general reputation in these respects, among those with whom he worked or lived; and if that reputation was bad, it may be taken as evidence tending to show notice to the master of the imcompetency or negligent character of such fellow-servant.

The degree of weight to be given such evidence in the proof of notice to the master of the incompetency or negligence of such fellow-servant will depend upon the length of time such reputation existed, and other circumstances of the particular case, the general rule being that the master is presumed to have known what was generally known to those among whom such fellow-servant worked or lived, and that the master is presumed to have known what he might have known by the exercise of due care and diligence.

Actual or constructive notice of the incompetent or negligent character of a servant to a person having the control of such servant, with power to discharge him, is in law notice to the master.

It is the duty of the master to discharge an incompetent, reckless or careless servant if he knows of the servant's incompetency,

recklessness or carelessness, or if by the exercise of due care and diligence he could have obtained such knowledge.

The incompetent or careless character of a fellow-servant may be proved by evidence of prior accidents to such servant, in employment similar to the present one, occasioned by his incompetence or carelessness; but no weight should be given to evidence of prior accidents unless such accidents are proved by the preponderance of the evidence to have been occasioned by the incompetence or carelessness of such servant.

The weight to be given to evidence of prior accidents, occasioned by the incompetence or carelessness of the fellow-servant, will largely depend upon the frequency and the times when they occurred.

It is a general rule that a servant entering into an employment which is hazardous, assumes the usual risks of the service, and those which are apparent to ordinary observation, and those which he may reasonably be presumed to have known.

Whether the servant is chargeable with such knowledge and consequent assumption of risk depends upon the facts of each case. Direct proof of such knowledge is not always necessary. Such knowledge, or absence of knowledge, is often to be inferred from the character of the employment and other circumstances of the case.

Where a servant who has been employed to work in a branch of the master's business where there is but little danger, is assigned by the proper authority to work in a hazardous branch of such business, it is the duty of the master, either personally or by some competent agent, to give such instructions and warning to the servant as to the character of his new employment as may reasonably enable him to understand and avoid the peril to which he may be exposed.

The degree or measure of the instruction or warning required must depend upon the circumstances of each case.

If the plaintiff at the time he was injured was working in a

place of danger beyond the scope of his employment, without the direction of any person having the authority to assign him to such work, he must be regarded as a volunteer in such work, who assumed the risks incident thereto, and he can not recover; but if he had been assigned to such work by any servant or agent of the master having authority to do so, then he was not a mere volunteer, but was properly engaged in said work.

A servant is entitled to assume that the master has exercised due care and diligence in the selection and retention of reasonably competent and careful fellow-servants, as was his duty to do—and the servant is not chargeable with knowledge of the incompetency or carelessness of his fellow-servant until he has notice thereof by information or by circumstances reasonably sufficient for that purpose.

*Murphy vs. Hughes et al., 1 Pennewill, 260.*

Whether a servant is chargeable with knowledge of the general reputation of his fellow-servant for incompetence or carelessness, or with knowledge of prior accidents occasioned by the incompetence or negligence of such fellow-servant, will depend upon the circumstances of the case. A servant employed as a common laborer would be under no obligation to inform himself as to the competency of a person employed in a different and dangerous capacity as a blaster, with whom he did not work and with whom he had no reasonable cause to suppose he would be required to work. And again, the probability that the servant had knowledge of his fellow-servant's character for incompetence or negligence, might be greatly diminished by evidence that he knew such fellow-servant for only a short time.

It is the duty of the master to make and promulgate proper rules for the government of his servants and business whenever it is so large or complicated as to make his personal supervision impracticable.

*Rex vs. Pullman Co., 2 Marvel, 347; Murphy vs. Hughes et al., 1 Pennewill, 259.*

And this is especially so if the business be also hazardous.

To warrant a verdict for the plaintiff it is necessary that the evidence which you have heard should support the material allegations of the plaintiff as set forth in some one or more of the counts of his declaration.

Where there is a conflict of testimony, the jury should reconcile it if they can, and if they can not, they should weigh and estimate it and give their verdict for that party in whose favor is found the greater weight or preponderance of the evidence.

In estimating the weight of the evidence the jury should consider the character of the witnesses, their means of knowledge of the facts of which they have testified, their fairness, their intelligence, their interest, and all other circumstances by which the value of their testimony may be properly determined.

If any of the witnesses have testified as to facts of which they had no knowledge except from hearsay, such testimony should be rejected. This, of course, does not apply to testimony as to general reputation, which is based upon what the witness has heard other people say.

If your verdict should be for the plaintiff, it should be for such a sum as in your judgment, from the evidence, will reasonably compensate him for his injuries, including his loss of time and wages, his pain and suffering in the past, and such as he may have in the future as the result of his injuries, and also for his permanent injuries and loss of ability to earn a living in the future.

*Murphy vs. Hughes et al., 1 Pennewill, 262.*

Verdict for plaintiff for $9119.