CHARLES GERRISH *vs.* THE NEW HAVEN ICE COMPANY.

New Haven & Fairfield Cos., Jan. T., 1893. ANDREWS, C. J., CARPENTER, TORRANCE, FENN and PRENTICE, Js.

The plaintiff, as servant of the defendant company, was employed in the hauling of ice from a pond into an ice-house by machinery operated by a steam engine, and, in adjusting some of the machinery that had got out of order, while the engine was stopped for the purpose, was placed in a position that would become one of great danger if the engine should be started. The company had a rule, known to all its employees, that the superintendent of the work should stand at a certain place where he could oversee all the work and have in reach a bell-cord by which he could signal the engineer when to stop and when to start the engine; and that when the engine was stopped on account of any disarrangement of the machinery the engineer should be personally notified and should not start the engine until specially directed to do so. At this time the superintendent had left the place to get some appliance needed, and by some unexplained accident the bell-cord was pulled and the engineer started the engine, and the plaintiff was seriously injured. Held that the company, both in not observing its own rule to have the superintendent at the point of control, and in his leaving the place without putting some person in charge of it, was guilty of negligence and liable to the plaintiff for the injury.

[Argued January 24th—decided March 6th, 1893.]

ACTION for an injury through the negligence of the defendant company; brought to the Superior Court in New Haven County. The defendants suffered a default, and the case was heard in damages before *Thayer, J.* Facts found and damages assessed at seven hundred dollars, and appeal by the defendants. The case is fully stated in the opinion.

*W. B. Stoddard* and *S. C. Loomis*, for the appellant.

1. The defendant was not guilty of negligence in law. The court below held the defendant liable, because it omitted to do some act which the court held that the law required of it. The finding shows: (1) That we provided properly constructed machinery and appliances, and that they were reasonably safe. (2) That we provided competent and suitable co-laborers. (3) That we had suitable rules by which the conduct of the workmen was governed, which rule was known to the plaintiff. (4) That we had a competent foreman on the premises, in attendance upon his duties. We claim that when we have done all this, we have done all that the law requires of us. Beach on Contrib. Negligence, §§ 125, 126, 129; *McElligott* v. *Randolph*, 61 Conn., 162. In *Warner* v. *Erie Railway Co.*, 39 N. York, 470, the court says: "The master is not and cannot be liable to his servant, unless there be negligence on the part of the master in that which he, the master, has contracted or undertaken with his servant to do. The master has not contracted or undertaken to execute in person the work connected with his business, but to select proper and competent persons to do so, and furnish them with adequate materials and resources for the work. If the persons so selected are guilty of negligence, this is not the negligence of the master. * * * Negligence cannot exist if the master does his best to supply competent persons. He cannot warrant the competency of his servants."

2. The plaintiff was guilty of contributory negligence. Had he exercised ordinary care he would not have been injured. He was grossly negligent in three ways:—(1) He should not have gotten into the run to perform this work. The float could have been easily moved to a point where he could have worked from the outside. (2) He should not have thrown the float so as to strike the bell-cord. (3) He should not have remained in the run after he had finished his work. The engineer had to walk to his engine, and start it after the bell rang, thus giving him plenty of time to remove from his dangerous position. Each of these three acts of negligence contributed directly to the injury, and had he not been negligent in them all he would not have been in-

jured. The exercise of prudence as to one of them would have saved him, but it was his triple negligence that caused the accident.

3. If there was any negligence it was that of the plaintiff's fellow-servants. Bishop and Andrews were both in law fellow-servants with the plaintiff. There can be no question in the case of the latter. But Bishop was also his fellow-servant. The fact that he was the secretary and superintendent of the company makes no difference. *Chicago & Alton R. R. Co.* v. *May,* 108 Ill., 288. He was not performing his duties as such on the day in question. He was simply performing the duties of foreman. The question then is, was Bishop, as foreman, a fellow-servant of the plaintiff. They were engaged in the same business; had one common end in view, to wit, the harvesting of the ice; were paid from one common source; derived authority from the same master; and were both subject to the same rules and regulations. A mining boss is a fellow-servant. *Reese* v. *Biddle,* 112 Penn. St., 72. See also *Lehigh Valley Coal Co.* v. *Jones,* 86 Penn. St., 432; *Del. & Hudson Canal Co.* v. *Carroll,* 89 id., 374; *Keystone Bridge Co.* v. *Newberry,* 96 id., 246; *Redstone Coke Co.* v. *Roby,* 115 id., 364.

*C. S. Hamilton,* for the appellee.

ANDREWS, C. J. The plaintiff was a servant of the defendant company and was injured while engaged in such service. This action was brought to recover for that injury. The case was defaulted and heard in damages. The superior court made a finding of facts as follows :—

The defendant is a joint-stock corporation organized under the laws of this state, and located and carrying on the ice business in the city of New Haven. Frederick F. Bishop is the secretary and superintendent of the company and general manager of its business. The corporation is now and for several years past has been the owner of an ice-house, with all the usual appurtenances for harvesting ice connected therewith, situated in the town of East Haven, near the

southerly end of Lake Saltonstall, the ice to fill the ice-house being cut from the lake. The ice is removed from the lake to the ice-house by means of endless chains, with floats or cross pieces attached, passing over an inclined plane or elevator, as it is called, which extends from the lake to the ice-house. This elevator, which is constructed of timber, begins in the lake and runs up at an angle of about thirty degrees to a point near the ice-house. Its upper end is about twenty-five feet above the ground. The elevator is so constructed that its upper side is a shallow trough about five feet wide, called the run. At each side of the run an endless chain passes from bottom to top, then passes down and back under the run to the water. Cross-pieces called floats, extending from one chain to the other, are attached thereto at intervals of about five feet, so that when the chains are put in motion the floats pass up through the trough. The chains are operated by a steam engine situated in a small engine house standing near the upper end of the elevator. When the work is in progress cakes of ice are floated up to the foot of the run, whence the floats carry them up through the run to slides, which extend from the elevator into the ice-house. The slides are so constructed that the cakes when placed upon them descend by force of gravity into the ice-house. There are three such slides for use at different periods in the process of storing the ice. One of these connects with the elevator at the top of the run, another a few feet below the top passes out to the south side of it, and a few feet below this is a third slide which passes out to the north side of the elevator. There is a platform at the top of the elevator and one at the point where the slide on the north connects with the elevator, but there is none connected with the slide on the south. When the different slides are being used, workmen stand upon these platforms to start the ice from the run along the slide. Steps or ladders extend from the top of the elevator to the ground, and furnish means of passing from one platform or slide to the others. A person stationed at the foot of the run commands a view of the entire works, the run, the men at work upon the platforms and slides, and

the men cutting and floating up ice from the lake. The superintendent and manager of the company stations himself here, and to enable him to signal the engineer when to stop or start the engine, a bell is placed in the engine house, and a cord attached to the bell and extending to the foot of the run is carried along the south side of the elevator by means of supports attached to the timbers thereof. The cord is uncovered and is placed so high as to be out of reach except at the foot of the run, where it is so placed as to be within reach of the person stationed there. The signal for starting or stopping the engine is a single ring of the bell, which can be given by pulling the cord. All of the appliances used in the conduct of the defendant's business were properly constructed and reasonably safe. All the employees of the defendant, including the superintendent, were competent and suitable for the business. For a person to enter the run when the chains and floats are in operation is dangerous.

Owing to the frequent breaking of the floats, the clogging of the run, the liability of the chains to get off the pulleys over which they pass, and other causes, it frequently becomes necessary for the workmen to enter the run. To avoid danger the defendant has a rule, known to the plaintiff and other employees, that the superintendent or person in charge of the foot of the run shall at such times cause the engine to be stopped and the engineer to be personally notified, and that after such notice the engineer shall not start the engine upon the ordinary signal, but upon a special direction to do so.

On the day of the accident described in the complaint, Mr. Bishop, the defendant's secretary and superintendent, was in general charge of the works and stationed at the foot of the run. The plaintiff was in the employment of the defendant and stationed upon the platform at the top of the run, engaged there with others in receiving the cakes of ice as they were delivered by the floats and in pushing them down the slides. One Andrews, another employee of the defendant, was at this time stationed upon the platform on the north side of the elevator above mentioned, pushing

ice down the slide upon that side of the run. He had been told by the superintendent to keep watch for broken floats, and to notify him, the superintendent, if any should be discovered, in order that the engine might be stopped before the broken float was carried over the top, as this was likely to disarrange the chains. Just before the accident Andrews discovered a broken float at a point in the run too high to be reached from the ground, and, allowing it to come up to a point where it would be convenient for him to remove the north end of it, notified Bishop, who at once pulled the cord, thus notifying the engineer to stop the engine, and it was stopped immediately. Bishop then asked Andrews if the broken float could be removed where it then was, and the latter replied that it could be if Bishop would send up the necessary wrenches. A boy was sent up with the wrenches. Bishop ordered the plaintiff to go down and help Andrews to take out the float, and then left the foot of the run, leaving no one in charge there, and went to the engine house to get a new float to be put in place of the broken one. The plaintiff went down the run to the broken float, and proceeded to remove the portion of it which was attached to the chain on the south side of the run. Bishop saw the plaintiff in the run, but he neglected to notify the engineer or to cause him to be notified of the fact, and the engineer had no knowledge that a man was in the run or that it was not safe to start the engine on the ordinary signal. The plaintiff supposed that Bishop had notified the engineer. With some difficulty the plaintiff removed the south end of the broken float and threw it to the ground, first looking to see that no one was below liable to be hit by it. The piece of float struck the ground a short distance south of the elevator and was afterwards found directly beneath the bell-cord above mentioned. The bell rang at this time and the engineer stepped to the engine and started it, supposing the ringing of the bell to be the signal to start. There was no direct evidence to show what caused the bell to ring, but it is found as an inference of fact from the above facts that

the piece of float thrown down by the plaintiff in some way hit the bell-cord and caused the bell to ring.

Considerable time was occupied by the plaintiff in removing the part of the float which he threw down, and during this time Bishop was in and about the engine-house talking with the engineer. Had the broken float been nearer the top of the run, the plaintiff, by standing upon the slide on the south side of the elevator, could have removed the south end of the float. But it was dangerous to attempt to stand upon this slide and work upon the float in the position where it was stopped, from the fact that the float was but little above the point where the slide emerges from beneath the run. There was not sufficient of the slide outside of the south line of the elevator to here afford a foothold for one at work upon the float, and the float was too low for one to work upon it conveniently or safely standing upon the slide. The end of the float could not be removed by a person standing upon a platform on the north of the run. When the engine started the plaintiff was caught by the floats, carried up to the top of the run, and forced down through the opening in the platform made for the passage of the chain and floats, and fell to the bottom of the elevator, receiving the injuries complained of.

When the float started the workman at the top of the run shouted to stop the engine. Had a proper person been stationed at the foot of the run within reach of the bell-cord at this time the engine could have been stopped before the plaintiff was drawn to the top of the run or had received any injury.

The defendant was guilty of negligence in having no suitable person in charge of the bell-cord after Bishop had left it, and in not giving notice to the engineer that the plaintiff was in the run.

The defendant claimed that the plaintiff, on the foregoing facts, was entitled to only nominal damages, and asked the court to hold—1st, that the defendant was guilty of no negligence ; 2d, that the plaintiff was guilty of negligence which contributed to the injury ; 3d, that if the plaintiff was not

guilty of contributory negligence his injury was caused by the negligence of his co-laborers and fellow-servants. The court overruled all the defendant's claims and rendered judgment for the plaintiff to recover substantial damages. From that judgment the defendant has appealed to this court and has assigned these rulings as reasons of appeal.

In the very recent case of *McElligott* v. *Randolph*, 61 Conn., 157, this court said:—" The rule of duty of master to servant is well settled in this state. It is the master's duty to exercise reasonable care to provide for his servant a reasonably safe place in which to work, reasonably safe appliances and instrumentalities for his work, and fit and competent persons as his co-laborers. It is equally well settled that performance of these duties cannot be effected by the simple giving of an order—by their execution being intrusted to another. The designation of an agent, however fit and competent that agent may be, for the execution of the master's duties, does not fill out the sum of the master's obligation nor serve to relieve the master from further responsibility. Until the agent thus selected and empowered in fact acts up to the limit of the duty of his master to act, the master's duty is not done. The master's duty requires performance. He may at his option perform in person or delegate performance to another. In either case reasonable care must be exercised in the doing of the act required to be done by the master." See also *Wilson* v. *Willimantic Linen Co.*, 50 Conn., 453 ; *Laning* v. *N. York Central R. R. Co.*, 49 N. York, 521 ; *Hough* v. *Texas & Pacific R. R. Co.*, 100 U. S. R., 213 ; *Davis* v. *Central Vermont R. R. Co.*, 55 Verm., 84 ; *Ford* v. *Fitchburg R. R. Co.*, 110 Mass., 240 ; *Harper* v. *Indianapolis & St. Louis R. R. Co.*, 47 Mo., 567 ; *Brodeur* v. *Valley Falls Co.*, 16 R. Isl., 448 ; *Chicago & N. W. R. R. Co.* v. *Jackson*, 55 Ill., 492.

" The duties so named are constant and uniform. In cases of a complex business there may be the subordinate duty growing out of these duties to establish suitable rules by which the business may safely be conducted and to exercise such supervision as will make it reasonably certain that the

business is being carried on pursuant to such rules. *Mulvey* v. *R. Isl. Locomotive Works*, 14 R. Isl., 204 ; *Wabash R. R. Co.* v. *McDaniels*, 107 U. S. R., 454, 460 ; *Pantzar* v. *Tilly-Foster Iron Co.*, 99 N. York, 368 ; *Ford* v. *Lake Shore &c. R. R. Co.*, 124 id., 493 ; *Whittaker* v. *Delaware & Hudson Canal Co.*, 126 id., 544 ; *Clarke* v. *Holmes*, 7 Hurlst. & Nor., 937.

It is also equally well settled that there is no duty belonging to the master to perform for the safety and protection of his servants that can be delegated to any servant of any grade so as to exonerate the master from responsibility to a servant who has been injured by its non-performance. *McElligott* v. *Randolph, supra ; Fuller* v. *Jewett*, 80 N. York, 46 ; *Mann* v. *Delaware & Hudson Canal Co.*, 91 id., 495, 500 ; *Corcoran* v. *Holbrook*, 59 id., 517 ; *Flike* v. *Boston & Albany R. R. Co.*, 53 id. 549 ; *Murphy* v. *Smith*, 19 Com. Bench, (N. S.,) 361.

The defendant is a corporation. Mr. Bishop is, and was, its superintendent and the general manager of the business. He must be presumed to have had all the powers which his position implies. On the day that the plaintiff was injured he was present and in general charge of the work there being done. He was there undertaking to perform duties which it was the business of the master to perform. If only the ordinary rules of law applicable to the relation of master and servant are contemplated, it is obvious that the Superior Court did not require anything of the defendant which the law does not require, and that there is no error in the judgment. *Nolan* v. *N. York, N. Haven & Hartford R. R. Co.*, 53 Conn., 472. But the case is much stronger. The defendant neglected its own rule. Mr. Bishop, as the master of the plaintiff, directed him to go into the run to aid in the removal of a broken float. He saw him in the run at work. It is found that " for a person to enter the run when the chains and floats were in operation was dangerous. To avoid the danger the defendant had a rule that the superintendent or person in charge at the foot of the run should at such times cause the engine to be stopped and the engineer to be notified; and that after such notice the engineer should not

start the engine upon the ordinary signal, but only upon a special direction to do so." This was a rule for the superintendent to obey. Upon obedience to it the safety of the plaintiff depended. Mr. Bishop was his master, as well as the superintendent. He did not notify the engineer that the plaintiff was at work in the run. Not only did he disobey the rule, but he went away from his post at the foot of the run without putting any one in charge of the bell-cord. In either aspect it was the neglect of the defendant which caused the injury to the plaintiff.

There is no error in the judgment appealed from.

In this opinion the other judges concurred.