## MALAY v. MT. MORRIS ELECTRIC LIGHT CO.

(Supreme Court, Appellate Division, First Department.   June 9, 1899.)

1. INJURIES TO EMPLOYES—FELLOW SERVANTS—INCOMPETENCY.
   An employé cannot recover for an injury caused by an act of a fellow servant, unless the latter was negligent, and was incompetent to perform the duties required of him, and the employer knew of his incompetency.

2. SAME—NEGLECT OF DUTY.
   An employé is incompetent, so as to make the employer liable for injuries inflicted on a fellow servant through his negligence, where he habitually neglects his duties, though he may be physically and mentally able to do well all that is requested of him.

3. SAME—EVIDENCE OF KNOWLEDGE.
   Defendant's dynamo engineer turned a current on a circuit while a lineman was hanging a lamp, and injured him, though the engineer had been informed of the lineman's intention to hang the lamp, and had promised not to turn on the current until he had received notice. Other employés testified that they had previously notified defendant's superintendent, authorized to discharge employés, of several other acts of the engineer showing him to be negligent and incompetent, and one of them told the superintendent that if he did not get rid of the engineer he would kill somebody. The superintendent testified that he investigated the complaints, and found no reason to believe that the engineer was not a good man for his position. *Held*, that a verdict for plaintiff was sustained.

Appeal from trial term, New York county.

Action by William Malay against the Mt. Morris Electric Light Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Argued before BARRETT, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

Henry J. Hemmes, for appellant.
Herbert T. Ketcham, for respondent.

INGRAHAM, J.  The learned trial judge submitted to the jury five specific questions: (1) "Was the plaintiff injured on July 6th, 1891, by any act of negligence on the part of Mathews?" to which the jury answered "Yes." (2) "Was the plaintiff guilty of any negligence which contributed to the accident?" to which the jury answered "No." (3) "Was Mathews incompetent to act as a dynamo engineer in the station of the defendant company?" to which the jury answered "Yes." (4) "Did the defendant company, prior to the 6th day of July, 1891, have notice of, or could it, by the exercise of reasonable diligence, have discovered, any facts which tended to show that Mathews was incompetent to perform the duties to which he had been assigned?" to which the jury answered "Yes." (5) "What damages did the plaintiff suffer by reason of the injury?" to which the jury answered, "Five thousand dollars." The

court then directed the jury to find a verdict for the plaintiff for $5,000, to which direction the defendant excepted. Before the submission of these questions to the jury, the defendant had made a motion to dismiss the complaint, and also a motion to direct a verdict in favor of the defendant. The decision of these motions was reserved by the court until the jury answered the specific questions, submitted to them. After the verdict of the jury, the motions were respectively denied, to which the defendant excepted.

The defendant, upon this appeal, insists that there was no evidence to sustain a finding by the jury that Mathews was incompetent to act as a dynamo engineer in the station of the defendant company, or that the defendant company had notice of, or could have, by the exercise of reasonable diligence, discovered, facts which would tend to show that Mathews was incompetent to perform the duties to which he had been assigned. The plaintiff's evidence justified a finding that his injury was caused by negligence on the part of Mathews, and the question of the plaintiff's contributory negligence was properly submitted to the jury. The plaintiff was employed by the defendant as a telegraph lineman and inspector. It was a part of his duty to hang lamps for the defendant company, and place the wires connecting these lamps with the defendant's power house. One Lowery was employed in the dynamo room of the defendant, and was in charge of the dynamos during the daytime. He was required to be on duty from 9 o'clock in the morning and until about 7:45 p. m.; one Mathews then taking his place and remaining in charge until he was relieved by another employé. It was Lowery's duty to remain in charge until the lights were turned on at night. Mathews would usually come to the power house of the defendant about 4 or 5 o'clock in the afternoon. He would then stay with Lowery until all the machines were turned on, between half past 7 and 8 o'clock, when Lowery would report off, and Mathews would take charge of the plant until 1 o'clock in the morning. A Mr. Fulton had general charge of the power house of the defendant company, having the power to employ the men and to discharge them; and a Mr. Young was the superintendent, having charge of everybody, including the linemen. It appeared from the plaintiff's evidence that on July 6, 1891, the plaintiff was ordered to hang a lamp at 103 Park Place; that he went to the station, and got a lamp, and there saw Mathews on duty; that plaintiff told Mathews that he was going to hang a lamp at 103 Park Place, and to be sure and not turn the current on until the plaintiff had notified him over the telephone that the lamp was hung, when he could give the circuit a test. Mathews said, "All right, Bill; starting time is not until 7:45," to which the plaintiff replied, "I don't know whether I will be done then or not, but I will telephone as soon as I get done." Mathews had full charge of the station at the time of this conversation, Lowery having been laid off that afternoon at 1 o'clock. The plaintiff went to the locality at which he was to hang the lamp, started to make the connection between the defendant's wires on one of the defendant's poles, standing on a ladder, about 10

feet from the ground, and while making this connection he received a charge of electricity over the wires. He fell backward from the ladder on which he was standing, and struck upon the sidewalk, and sustained the injury to recover for which this action was brought. The accident happened some time between 6 and half past 6 o'clock in the evening. Between 6 and half past 6 o'clock— about 25 minutes after the plaintiff left the power house—Mathews started up the dynamos, closed the circuit upon circuit 15, upon which the plaintiff was working so as to turn the current on this circuit, and it was in consequence of Mathews turning on this current while the plaintiff was at work connecting the wires that he received the shock which caused him to fall and sustain the injury. There was also evidence that during the six months before January 1st machines were burned up while in Mathews' charge, of which fact Fulton, who had charge of the power house for the defendant, and who employed and discharged employés, had notice; that on March 7, 1891, before the accident, a converter was burned up, and Mathews' arms and hands were burned half way to the elbow; that some time before the accident a switchboard in charge of Mathews was burned; that Fulton had notice of that fact, and that he (Fulton) then said that Mathews was a fool; that Horahan, who was in the employ of the defendant as chief lineman, told Fulton that he had better get rid of Mathews, or he would kill himself or somebody else; that Horahan informed Fulton that one of the linemen had made a complaint that Mathews had started the dynamo up on him, and the witness said to Fulton, "if you don't get rid of that fellow, he will either kill himself or kill somebody else down there." This lineman had said that Mathews started the dynamo up on him when he was out on an open circuit, and the witness told that to Fulton. Fulton said that Mathews had no right to do it; that Lowery was there, and ought to have looked out for that. The witness further testified to the interview with Fulton after the fire which was caused by this switchboard being burned out, and that Fulton's attention was then called to Mathews' negligence. The witness also told Young, the superintendent, that Mathews had started the circuit on Garber, a lineman, and came near killing him, a night before; that Garber was out on an open circuit on 106th street; that just as soon as he got the circuit, and the wires were closed, "up came the lights on him, and didn't give him any time to get off the pole, or anything else." In reply to this, Young said, "You told Fulton about it?" The witness said, "Yes." There is other evidence to show that in the six or eight months preceding this accident Mathews was constantly, from ignorance or inattention, making mistakes in the management of this machine. Cochran, who was in charge of the dynamo room during this period, testified that he spoke to Mr. May, the vice president, about Mathews' incompetency; that Mr. May instructed him to talk to Fulton; that the witness told Fulton it was impossible for him to get along with the man; that the man was incompetent; and that Fulton said, "Well, I don't want to have any quarreling or contention, and if

you know of any young man you are acquainted with around New York, why get him;" that on several other occasions the witness told Mr. May (vice president) that Mathews was a dangerous man to have around the place; and that on several occasions the witness told Fulton that Mathews was incompetent, and that he would do damage there. On the part of the defendant, Young was called as a witness, and testified that several times reports were brought to him by Cochran as to Mathews' incompetency, but that he investigated each charge, and found no reason to believe that Mathews was not a good man for the position, and that while he was there he considered Mathews a perfectly competent man.

To entitle the plaintiff to recover, there must be evidence sufficient to sustain a finding of the jury that the accident was caused by the negligence of Mathews; that Mathews was not a competent man to perform the duties required of him by the defendant; and that the defendant, before the accident, had knowledge or notice of Mathews' incompetency. As was said by Judge Brown in Coppins v. Railroad Co., 122 N. Y. 564, 25 N. E. 915:

"The defendant's duty to the plaintiff, so far as reasonable care would accomplish it, was to employ only competent men in the management of its road. A competent man is a reliable man; one who may be relied upon to execute the rules of the master, unless prevented by causes beyond his own control. Hence, incompetency exists not alone in physical or mental attributes, but in the disposition with which a servant performs his duties. If he habitually neglects those duties, he becomes unreliable; and, although he may be physically and mentally able to do well all that is requested of him, his disposition toward his work and toward the general safety of the work of his employer and to his fellow servants makes him an incompetent man."

And in Wright v. Railroad Co., 25 N. Y. 565, it is stated that:

"The master is liable to his servant for any injury happening to him from the misconduct or personal negligence of the master; and this negligence may consist in the employment of unfit and incompetent servants and agents. · * * * The employer does not undertake with each or any of his employés for the skill and competency of the other employés engaged in and about the same service, * * * since neglect and want of due care in the selection and employment of the agent or servant through whose want of skill or competency an injury is caused to a fellow servant must be shown in order to charge the master."

Applying this principle, we think the evidence justified the submission of the question as to the defendant's negligence to the jury. The plaintiff was employed to perform for the defendant a hazardous operation. In joining these two wires together he subjected himself to the effect of a current passing from one wire to the other. It was the defendant's duty to provide proper machinery, and to employ faithful and competent servants, to prevent injury to the plaintiff when engaged in the performance of this duty. If the defendant employed an incompetent servant, and gave to him charge of the machinery by which the current would be turned onto those wires on which the plaintiff was sent to work, or if those servants that it had employed had shown by their previous conduct that they could not be relied upon to execute the rules of the master necessary for the protection of the other servants employed in their work, or that they recklessly, and in disregard of ordinary rules of prudence

and care, exposed their fellow servants to unnecessary danger, and notice of such neglect or incompetency was brought home to the master, and an injury resulted from the act of this incompetent servant so employed, the master is liable. In this case, the evidence was sufficient to show that Mathews, either from ignorance or from recklessness, was an incompetent man, and unfit to be intrusted with this dangerous machinery, and that knowledge of the fact had been brought home to the master. It is true that the person charged with the duty of employing or discharging Mathews testified that he had investigated complaints, and had satisfied himself that they were unfounded. That question was properly submitted to the jury to determine whether or not, as a matter of fact, Mathews was a competent man for the work that he was employed to do; and, if he was incompetent, whether the defendant had such knowledge of his incompetency as made it negligent for them to retain him in its employ. The verdict of the jury is not unsupported by the evidence, and we would not be justified in reversing it upon that ground. After an examination of the whole record, we see no reason for disturbing the verdict of the jury upon any question submitted to them.

Nor do we think the verdict excessive. The injury was severe, and there was evidence to show that it is permanent. It interferes with the plaintiff in the performance of his work, and we do not think we would be justified in interfering with the verdict upon that ground. We have examined all the objections to testimony to which our attention has been called by the appellant, but we find that none of them would justify a reversal of the judgment.

Upon the whole case we think the judgment was right, and should be affirmed, with costs. All concur.