JAMES GRIFFIN *v.* BOSTON & MAINE RAILROAD.

January Term, 1913.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed December 16, 1913.

*Master and Servant—Incompetent Fellow Servant—Master's Duty and Liability—Knowledge of Incompetency—Evidence—Admission by Foreman—Rules of Work—Enforcement—Vice Principal—Opinion Evidence—Competency of Witnesses—Assumed Risk—Review—Presumptions—Question Not Raised Below—Admissions Under Pleadings—Witnesses—Impeachment—Declarations—Refreshing Memory—Admission of Memorandum—Documentary Evidence—Train Register —Admissibility —Hearsay —Questions for Jury—Reversal in Part.*

Where a person's knowledge of a fact is pertinent to the issue, it may be proved by his statement.

A master is liable for injuries to a servant resulting from failure to exercise reasonable care in selecting coservants or from retaining coservants after he has actual or imputed knowledge of their incompetency.

A master owes his servant the duty of exercising reasonable supervision over his fellow servants to the end that their incompetency may be discovered, and the hazards thereof eliminated from the service, and the master is chargeable with the knowledge that such supervision reveals or ought to reveal.

The "incompetency" of a servant, which makes the master liable to a fellow servant for injuries resulting therefrom, includes temperament and disposition as well as required technical knowledge and physical ability, and an habitually careless servant, or one of a reckless disposition, is incompetent, though otherwise fully equipped properly to discharge his duties.

In a servant's action for injuries from having been struck by a locomotive while he was working on a railroad bridge, owing to the claimed incompetency of the engineer, who, it was claimed, drove over the bridge at a speed in excess of that permitted by a rule of defendant, evidence that, on an occasion before the accident when the engineer's train crossed the bridge, the superintendent in charge of the work said that the engineer had been driving carelessly across the bridge, and would be killing somebody, and that, if he did not stop it, the superintendent would have to report him, was admissible to show the notoriety of the engineer's carelessness, as tending to show that defendant, through its proper officers, either knew or ought to have known it.

Though a master performed his duty of promulgating adequate special rules for the protection of his servants working in a specially dangerous place, he had the further non-delegable duty of using reasonable care to secure the observance of those rules, and shortage in that duty would make him liable for injuries resulting from non-compliance with the rules.

Where work was being done on a railroad bridge over which trains were running, the duty of securing the observance of a rule requiring trains to slow down to 4 miles an hour could not be delegated so as to relieve the railroad company of liability, and so the superintendent in charge of the work, who was required to see that the rule was observed, was a vice-principal in that regard, even though his authority was limited to reporting to some superior any delinquency of the trainmen, and his knowledge of

an engineer's violation of the rule was the knowledge of the company.

Where a witness appears to have acquired some knowledge that persons in general do not have in respect of a matter in question he may properly be allowed to give his opinion in respect thereof.

In a servant's action for injuries from having been struck by a locomotive while he was working on a railroad bridge, it was not error to allow a witness who had some opportunity to observe the methods used in such jobs, and had acquired some knowledge about such work that persons in general did not have, to testify, against the objection that he was not qualified to speak as an expert, that the bridge was not a safe working place, because there was no platform or runway provided for the workmen.

Where plaintiff was working on a railroad bridge under the protection of a special rule promulgated by the railroad company requiring trains to slow down to 4 miles an hour in crossing the bridge, he was justified in understanding that trains would be so slowed down, and as he was injured by a train crossing the bridge at a speed of more than 4 miles an hour, though the injury could have been avoided had there been a platform or runway whither he might flee, and though he assumed the risk incident to the lack thereof, still the lack of such platform was not the sole proximate cause of the accident, but a cause concurrent with a train running at the prohibited speed, which was an extraordinary danger that he did not assume as matter of law.

Where a declaration consists of several counts, the admission of evidence properly received only as to some of the counts is not rendered erroneous by the fact that those counts were subsequently disregarded and the case was submitted to the jury only on another count.

Where a servant's action for injuries was submitted to the jury only on the count charging incompetency of a fellow servant, evidence as to the absence of a platform or runway on the bridge, if outside the issue, was harmless to defendant.

The exclusion of offered evidence that is immediately thereafter received is harmless.

It is not error to exclude evidence of a fact that the other party has admitted.

In a servant's action for injuries owing to the claimed excessive speed of the train by which he was struck, and which the fireman testified was moving only 4 or 5 miles an hour, testimony that immediately

after the accident he was charged with killing plaintiff, and told that the train was going 30 miles an hour, and that he answered, "Don't blame me, I wasn't running the train," was admissible to impeach the witness by showing that he did not deny the charge as to the speed of the train.

Where the record does not show the contrary, it will be presumed on review and in support of the judgment that testimony admissible only in impeachment of a witness was so limited.

Where one gives in evidence a material declaration of another, he is entitled to show so much of the circumstances in which it was made and the conversation of which it was a part as is necessary to give force and certainty to it, and the same rule applies to an admission by silence or a non-responsive or evasive answer.

Where witnesses testified that certain entries in train registers were truthfully made by them in due course of business, the books were admissible as confirmatory evidence, even though the witnesses had no independent recollection of the facts recorded.

In a servant's action for injuries owing to the claimed incompetency of an engineer, where there was a dispute as to whether the engineer was in charge of trains that violated a rule on certain prior occasions, and it appeared that the railroad company at designated stations kept train registers in which the conductor of each train was required in his own hand to enter his name, the name of the engineer, and certain other facts, that these registers were the only source of the conductors' information as to what trains had arrived and left, and as to superior trains, that conductors relied thereon, and that this had been the usual course for several years, entries in those registers shown to have been made in due course of business by a conductor who was ill and unable to attend court were admissible to show that the claimed incompetent engineer was not in charge of the trains claimed to have violated the rule.

The registers, properly authenticated and verified, were also admissible as independent evidence of the facts therein recorded, for they may properly be denominated *quasi* public records.

In a servant's action for injuries while working on a railroad bridge, wherein it was claimed that the alleged incompetent engineer of the train that struck plaintiff ran it over the bridge at a speed exceeding that permitted by a special rule of the railroad company, and that he had done the like before, where it appeared that, when the assistant division superintendent received complaints from the superintendent in charge of the work at the bridge, he

ascertained who the offending engineer was and reported the matter to the master mechanic with instructions to take the matter up with the engineer, the written reports received by the assistant superintendent from the master mechanic, including what the engineers said for themselves, were not admissible, as they did not differ in character or quality from extrajudicial statements of the persons named.

In a servant's action for injuries while working on a railroad bridge, where it was claimed that the alleged incompetent engineer of the train that struck plaintiff ran it over the bridge at a speed exceeding that permitted by a special rule of the railroad company, and there was evidence that he had done the like at least twice before, and that his speed, in view of the conditions at the bridge, was excessive and dangerous, the question of his incompetence was for the jury.

In an action by a railroad employee for injuries from having been struck by a train while he was fleeing across a bridge on which he was working, evidence *held* to make his contributory negligence a question for the jury.

Where on review, after a full trial on the merits, error is found in respect of rulings affecting liability only, and there is no suggestion that the damages awarded are unfair, or that any error or misconduct affected them, a retrial will be granted only as to the question of liability.

CASE for negligence. Plea, the general issue. Trial by jury at the April Term, 1912, Windham County, *Fish,* J., presiding. Verdict and judgment for the plaintiff. The defendant excepted. The opinion states the case.

*William W. Stickney, John G. Sargent, Homer L. Skeels* and *George L. Hunt* for the defendant.

*Robert C. Bacon* and *Herbert G. Barber* for the plaintiff.

The "incompetency" of a servant, which will render the master liable to a coservant, does not refer merely to physical and mental attributes, but includes temperament and disposition. *Furlong* v. *R. R.,* 83 Conn. 568, 78 Atl. 489; *Whitaker* v. *R. R.,* 126 N. Y. 544, 27 N. E. 1042; *Coppins* v. *R. R.,* 122 N. Y. 557, 25 N. E. 915; *First National Bank* v. *Chandler,* 144 Ala.

286, 39 So. 822; *East Tenn. R. R.* v. *Wright,* 100 Tenn. 56, 42
S. W. 1065; *Robbins* v. *R. R.,* 107 Me. 42, 77 Atl. 537; *Tucker* v.
*Telephone Co.,* 132 Mo. App. 418, 112 S. W. 6; *Giordano* v.
*Granite Co.,* 3 Penn. (Del.) 423, 52 Atl. 332; *Met. R. R.* v.
*Fortin,* 203 Ill. 454, 67 N. E. 977; *Maitland* v. *Paper Co.,* 97 Wis.
476, 72 N. W. 1124; *Young* v. *Gas Co.,* 133 Wis. 9, 113 N. W. 59;
*Dossett* v. *Lumber Co.,* 40 Wash. 276, 82 Pac. 273; *Pfudl* v.
*Romer Sons,* 107 Minn. 353, 120 N. W. 302; *O'Hare* v. *R. R.,* 95
Mo. 662, 9 S. W. 23; *R. R.* v. *Ruby,* 38 Ind. 294, 10 Am. Rep.
111; *Houston R. R.* v. *Patton,* 9 S. W. 175; *Int. R. R.* v. *Branch,*
56 S. W. 542; *R. R.* v. *Brown,* 65 Fed. 941; *Smith* v. *Lumber Co.,*
64 Minn. 447, 67 N. W. 358; *So. Pac. R. R.* v. *Huntsman,* 118
Fed. 412; *R. R.* v. *Camp,* 65 Fed. 952; *Grube* v. *R. R.,* 98 Mo.
330, 14 Am. St. Rep. 645; *St. Louis Co.* v. *Senginer,* 179 Ill. 330,
53 N. E. 733; *Evansville Co.* v. *Guyton,* 115 Ind. 450, 17 N. E.
101; *Hilts* v. *R. R.,* 55 Mich. 437, 21 N. W. 878; *Missouri R. R.*
v. *Day,* 136 S. W. 435; *Crouch* v. *Watson Coal Co.,* 46 Iowa 22.

It is not necessary in order to impute DeRocher's knowledge
to the defendant that he should have had the power to discharge
Harvey. It is sufficient if it was DeRocher's duty to act in any
way, if only to the extent of reporting Harvey. *Williams*
v. *R. R.,* 109 Mo. 475, 18 S. W. 1098; *R. R.* v. *Henthorne,* 73 Fed.
634; *Coal Co.* v. *Dickson,* 10 Kan. App. 391, 61 Pac. 450.

POWERS, J. The declaration contained several counts, but
the case was submitted to the jury on the fifth, only. This
charged the defendant with negligence in the matter of furnish-
ing the plaintiff with suitable fellow workmen.

The work in which the plaintiff was engaged when injured
consisted in raising the defendant's bridge over the West River,
a mile or so north of Brattleboro station. This bridge, so far
as we need to describe it, was about 300 feet long, and carried
a single track laid on twelve foot ties set from four to six inches
apart. There were three spans, of which the middle one only,
had overhead work; the two end spans afforded no opportunity
for a workman to step aside to avoid trains, which were being
operated over the bridge during the work. There was evidence
that a platform or run-way should have been built alongside the
bridge, wide enough to allow a workman to step off onto it when
a train passed. The defendant had promulgated a rule that all
trains should slow down to four miles per hour in crossing the

bridge, and had erected "slow-boards" about eleven hundred feet from either end of the bridge, on which was inscribed, "Slow down to four miles per hour." All this was known to the plaintiff, and he expected that this rule would be complied with, and did not know of any violations of it.

The plaintiff was a common laborer. His duties took him to different parts of the work, and required him to cross the bridge. sometimes. On the morning of the accident, January 28, 1910. the plaintiff and another workman, Tom Griffin, were about their work under the track at the north end of the bridge. They were directed by the boss, Mike Dwyer, who, in the absence of the superintendent, was in authority, to go to the south end of the bridge to work; they climbed up onto the bridge, and with Dwyer started across on the ties,—the plaintiff following the other two. When they were about midway of the south span, the plaintiff discovered train 73, which was being driven by engineer Frank Harvey, approaching from the south, and then nearly to the south end of the bridge. All three ran as fast as they could toward the south abutment. Dwyer made it all right; Griffin got far enough to jump off onto the sloping embankment; but the plaintiff, not having time to reach the embankment into about twenty-five feet, got out as far as he could on the east side of the track, to avoid the train if possible. He was hit by the engine and thrown off onto the frozen ground twenty-five or thirty feet below, and severely injured. There was evidence that the train was running at a speed of about twenty miles an hour, and that no whistle was sounded. The work going on at the time was making much noise, and there were no signalmen to give warning of approaching trains. Just south of the bridge was a curve in the track, and certain temporary structures were so erected there as to obstruct the view; so that one on the bridge was unable to see in that direction more than forty feet.

One DeRosher was the superintendent of the work; and he was charged with the duty of keeping tab on the trains and seeing to it that they came down to four miles per hour. This direction was given him by the assistant superintendent of the defendant's Connecticut and Passumpsic Division.

As we have already seen, the case was submitted on the theory that Harvey and the plaintiff were fellow-servants, and they are to be so treated here. For the purpose of establishing the inefficiency of Harvey, as one step in the proof to charge the

defendant, the plaintiff introduced as a witness, Archie Livingston, a blacksmith on the job, who testified that on two occasions, one a few days before the accident, the other on the morning of January 26, he had seen Harvey run a train at a fast rate of speed across this bridge. That on the first of these occasions, Harvey was running train 90 across the bridge at a speed of 8 or 10 miles an hour. On the other, he was running 73 northerly across the bridge at a speed of 12 or 15 miles an hour. The witness also testified to other trains on which he had seen Harvey. The defendant denied that Harvey was the engineer of 73 on January 26, or of 90 on the other occasion referred to by the witness.

Subject to defendant's exception, the plaintiff was allowed to show that when train 73 went over the bridge on January 26 at a speed of 12 or 15 miles per hour, DeRosher said, in substance, that Harvey had been driving carelessly across the bridge, and would be killing somebody, and if he didn't stop it, he would have to report him. The purpose of this evidence was to show DeRosher's knowledge of Harvey's habitual carelessness. The only objection to it was that DeRosher did not represent the company.

If DeRosher's knowledge of Harvey's fast running was pertinent to the issue, it could be proved by his statement. *McAuley* v. *Western Vt. R. Co.*, 33 Vt. 311, 78 Am. Dec. 627. So DeRosher's relation to the company must be examined.

An employer is liable to an employee for injuries resulting from a failure to exercise reasonable care in selecting co-employees, or from retaining co-employees in the service after he knows of their incompetency, or by the exercise of reasonable care he might have known of it. *Gulf etc. Ry. Co.* v. *Hays*, 40 Tex. Civ. App. 162, 89 S. W. 29; *Hilts* v. *Chicago & G. T. Ry. Co.*, 55 Mich. 437, 21 N. W. 878; *Jensen* v. *Great Northern Ry. Co.*, 72 Minn. 175, 75 N. W. 3, 71 Am. St. Rep. 475; *Lake Shore & Mich. So. Ry. Co.* v. *Stupark*, 123 Ind. 210, 23 N. E. 246; *Murphy* v. *Hughes*, (Del.) 40 Atl. 187; *Holland* v. *T. C. I. & R. Co.*, (Ala.) 12 L. R. A. 232, 8 South. 524; *Gilman* v. *Eastern R. R. Co.*, 13 Allen, 433, 90 Am. Dec. 210; *Furlong* v. *N. Y. N. H. & H. R. Co.*, (Conn.) 78 Atl. 489, 21 Ann. Cas. 937; *Wabash Ry. Co.* v. *McDaniels*, 107 U. S. 454, 27 L. ed. 605, 2 Sup. Ct. 932; *So. Pac. Co.* v. *Heltzer*, 1 L. R. A. (N. S.) 288; *Giordano* v. *Brandywine Granite Co.*, (Del.) 52 Atl. 332.

The master's duty toward his employees does not end with the selection and engagement of proper and fit co-servants. He must exercise a reasonable supervision over them, to the end that their subsequent incompetence may be discovered and the hazards thereof eliminated from the service. We need not here analyze this requirement to determine the exact degree of care called for, or how it compares with that demanded by the law in the original engagement of co-servants, of which it is a continuation, or in the supervision and inspection of machinery, to which it is closely akin. Nor need we inquire how far a master may rely upon a presumption of the continuance of competency and fitness. It is enough for present purposes, to state the rule and to say that the master is chargeable with all the knowledge which such supervision discovers or ought to discover.

The true significance of the term ''incompetency'' should not be overlooked. It embraces habitual carelessness. For, though a servant is equipped with sufficient technical knowledge and physical ability to discharge his duties properly, a reckless disposition may render him utterly unfit to be allowed to discharge duties which bring him into contact with others. The term, then, includes something more than physical and mental attributes; it includes temperament and disposition. *Hamann* v. *Milwaukee Bridge Co.*, 127 Wis. 550; 106 N. W. 1081, 7 Ann. Cas. 458; *Consolidated Coal Co.* v. *Seninger*, 79 Ill. App. 456, affirmed, 179 Ill. 370, 53 N. E. 733; *Malay* v. *Mt. Morris Elec. Lt. Co.*, 41 App. Div. 574, 58 N. Y. Supp. 659; *Simplex Ry. Appliance Co.* v. *Kameradt*, (Ind.) 102 N. E. 129; *Furlong* v. *N. Y. N. H. & H. R. Co.*, (Conn.) 78 Atl. 489, 21 Ann. Cas. 937.

The admission of DeRosher's statement was not error. It was competent for the plaintiff to show the notoriety of Harvey's carelessness as evidence tending to show that the company, through its proper officers, knew, or in the exercise of proper diligence ought to have known of it.

Moreover, the exigencies of the situation demanded extra precautions. The undertaking of raising this bridge while at least fourteen trains were running over it during working hours called upon the defendant for special rules to protect the workmen. The defendant appreciated this, and met the requirement, adequately so far as shown, by the promulgation of the rule already referred to. But here, again, its duty did not end. It was its duty to use reasonable care to see to it that this rule was

observed and complied with; and its failure in this respect would make it responsible for injuries resulting from non-compliance therewith. *Whittaker* v. *D. & H. Canal Co.,* 126 N. Y. 544, 27 N. E. 1042; *Richmond & D. R. Co.* v. *Hissong,* 97 Ala. 187, 13 South. 209; *Texas & N. R. Co.* v. *Echols,* 87 Tex. 339, 27 S. W. 60, 28 S. W. 517; *Rutledge* v. *Mo. Pac. R. Co.,* 123 Mo. 121, 24 S. W. 1053, 27 S. W. 327; *Gerrish* v. *New Haven Ice Co.,* (Conn.) 27 Atl. 235; *Merrill* v. *Oregon Short Line R. Co.,* 29 Utah 264, 110 Am. St. Rep. 695, 81 Pac. 85. This duty is personal to the master, and cannot be so delegated as to relieve him of liability, though the servant entrusted with it be ever so competent and faithful. While discharging that duty the servant is the representative of the master, and his default is the master's default.

There was evidence indicating that by the defendant's system of doing business this duty of supervision belonged to its superintendent's department; and, as shown above, it was specially assigned by that department to DeRosher, the man in charge of the work. The result was that DeRosher, while he was supervising the handling of trains over the bridge and seeing to it that the rule referred to was obeyed, was a vice-principal, since he was then discharging a duty that the law put upon his master. *Furlong* v. *N. Y. N. H. & H. R. Co., supra; St. Louis, Ark. & Tex. R. Co.* v. *Triplett,* (Ark.) 15 S. W. 831, 16 S. W. 266, 11 L. R. A. 773; *Merrill* v. *Oregon Short Line R. Co., supra; Union Pac. R. Co.* v. *Snyder,* 152 U. S. 684, 38 L. ed. 597, 14 Sup. Ct. 756; *Davis* v. *Cent. Vt. R. Co.,* 55 Vt. 84, 45 Am. Rep. 590; *Houston* v. *Brush & Curtis,* 66 Vt. 331, 29 Atl. 380; *Hayes* v. *Colchester Mills,* 69 Vt. 1, 37 Atl. 269; *Vaillancourt* v. *Grand Trunk R. Co.,* 82 Vt. 416, 74 Atl. 99; *Marshall* v. *Dalton Paper Mills,* 82 Vt. 489, 74 Atl. 108, 24 L. R. A. (N. S.) 128; *Lincoln* v. *Cent. Vt. Ry. Co.,* 82 Vt. 187, 72 Atl. 821, 137 Am. St. Rep. 998; *Kiley* v. *Rutland R. Co.,* 80 Vt. 536, 68 Atl. 713, 13 Ann. Cas. 269.

The cases cited to this point by the defendant are clearly distinguishable from the case in hand, for the servants there involved were not charged by the master with this duty of supervision, either generally or specially.

The result would be the same if we construed the record to mean that DeRosher's authority in this respect was limited to reporting the delinquencies of the trainmen to some superior. The fact would remain that he was discharging a duty which was

personal to the master and to that extent was a vice-principal. 1 Labatt, Mast. & Serv. §150.

The part of the Barnes deposition that was admitted subject to exception was to the same effect as the testimony of Livingston, above discussed, and need not be separately considered. The defendant's contention that the deposition shows that all that Barnes knew of Harvey's previous running was derived from DeRosher's statement is not borne out by the deposition when properly interpreted.

Livingston was allowed to testify as an expert that the bridge was not a safe working place, because there was no platform or run provided for the workmen. The defendant excepted and based its objection on two grounds: First, because the witness was not qualified to speak as an expert; and second, because it was immaterial whether such a structure should or should not have been provided, since the plaintiff assumed the risk of its absence, which was obvious.

The witness had had some opportunity to observe the methods used on such jobs, and whether he classed himself as an expert or not, he appears to have acquired some knowledge about such work that persons in general do not have. This was enough. *Mason* v. *Fuller,* 45 Vt. 29. There being some evidence of qualification, the finding of the trial court is not revisable. *Watriss* v. *Trendall,* 74 Vt. 54, 52 Atl. 118; *Lincoln* v. *Cent. Vt. Ry. Co.,* 82 Vt. 187, 72 Atl. 821, 137 Am. St. Rep. 998.

Assuming that the record shows that the plaintiff knew and appreciated the dangers of working on the bridge, which was without a runway as he could see, it does not necessarily follow that he assumed the risk involved in his accident. If the lack of a runway had been the sole proximate cause of the accident, we might have to hold that he assumed the risk;—if, for instance, he had fallen from the bridge on account of the absence of a runway. But his injuries did not result from the lack of a runway, alone; this lack, together with an over-speeding train caused them; to be sure he knew trains were to pass and he was to look out for them; but he also knew, or was justified in understanding, that they were to be slowed down to four miles an hour,—a speed about equal to that of a walking horse or active man. Such trains counted as ordinary hazards of the occupation. But the train that hit the plaintiff counted as an extraordinary hazard, as it was running at a forbidden and dangerous speed.

This was not an assumed risk, though a runway would have saved him.

Wilson, a railroad bridge engineer, also testified, subject to defendant's exception, that a run should have been provided. The objection made was that the absence of the run was obvious; that the plaintiff had been familiar with conditions there for several months; that he walked out from a place of safety in front of an approaching train; and that the evidence was not material to the issue in view of the plaintiff's own testimony. It is now argued that inasmuch as the case was submitted to the jury only on the fifth count, which was predicated on the ground of negligence in providing suitable co-servants, the evidence was outside the issue and should have been excluded. Of this claim it is sufficient to say that it was not made below. The whole tenor of the objection there was that the plaintiff assumed the risk. The allusion to the issue was not calculated to call the court's attention to the point now made, but would naturally be understood to refer to the plaintiff's knowledge of the conditions and their dangers. But lest it be assumed from this disposition of the question that error would be found if the point was considered, it may not be amiss to say that when this testimony came in, the other counts of the declaration were before the court. So evidence was admissible which tended to establish the allegations of any of the counts; and the evidence in question did so tend. Moreover, if this evidence was outside the issue, it could not have harmed the defendant.

The defendant offered to show by Levi Raymond that it was the custom of the workmen, during all the time this work was going on, to step out on the floor beams when a train came along, and allow it to pass. The offer was excluded and the defendant excepted. But the defendant was unharmed, for the witness was then allowed to testify that this was just what the men did, in fact, do. *Knapp* v. *Wing*, 72 Vt. 334, 47 Atl. 1075; *Davis* v. *Randall*, 85 Vt. 70, 81 Atl. 250.

It was not error to exclude the defendant's offer to show by Weaver and others that DeRosher repeatedly instructed the men to take plenty of time and to look out for themselves when trains came along. The purpose of the offer, as shown by the record, was to show that the plaintiff was to look out for himself while at work there, and that he so understood it. But the plaintiff admitted this, so there was no occasion to give evidence of

it, and the offer was properly excluded.  *Ainsworth* v. *Hutchins,* 52 Vt. 554.

Leo Forgette, fireman on the engine which injured the plaintiff, was a witness for the defendant, and testified that the train was moving about four or five miles an hour at the time.  It appeared that after the train stopped, this witness went down the bank to where the injured man was, and for the purpose of impeaching him as a witness, he was asked about a charge of excessive speed there made to him by Dwyer.  He denied that he knew Dwyer, and said he did not remember that anyone said anything about the speed of the train.  He was then asked if a man didn't say to him with an oath, "You have killed that man, and now you will pay for it; that train was going thirty miles an hour."  And he was also asked if he didn't reply, "Don't blame me, I wasn't running the train."  Both these statements, he denied.  Witnesses for the plaintiff testified to them in rebuttal.  All this was subject to the defendant's exception.  It was competent for the plaintiff to show in impeachment of the witness that he did not deny the charge made as to the speed of the train.  He had testified that it was moving at a very slow rate, and when he was confronted with the statement that it was going at the rate of thirty miles an hour it would be most natural for him to make a more or less vigorous denial.  The fact that he did not, would be for the consideration of the jury as an impeaching circumstance, but not otherwise.  We must assume that it was thus limited; the contrary not appearing.  *Limerick Nat. Bank* v. *Adams,* 70 Vt. 132, 40 Atl. 166.  Nor can we say that too much was received.  When one gives in evidence a material declaration of another, he is entitled to show enough of the circumstances in which it was made and the conversation of which it was a part to give force and certainty to it.  *Blaisdell* v. *Davis,* 72 Vt. 295, 48 Atl. 14.  An admission though it be by silence, or a non-responsive or evasive answer, is of the same character, and is governed by the same rule.

The defendant attempted to make use of its train registers and the entries therein.  The character of these books and the purpose they served may be thus stated:

The rules of the defendant required that there be kept at Greenfield, Brattleboro, and Claremont Junction registers in which was kept a record of train movements, and other facts.  The conductor of each train arriving or departing from these stations

was required to enter, in his own hand, and in proper columns, his own name, the name of his engineer, the signals carried, the time of his arrival or departure, and some other things. When an engine was running light, the engineer was required to make the entries. By referring to these registers, a conductor can ascertain what trains have arrived and left, and superior trains, if any. The registers are the only source of this information, without which business would be seriously crippled, for, on a single track road, a conductor has to run "against" trains, and, before he can leave the station, he must see that all superior trains and trains having rights over him have left. Upon these registers, conductors rely in determining the movements of their own trains. This method has been the usual course of the defendant's railroading for seven years, at least. These registers were offered in three different ways: First, various conductors testified concerning the books themselves and certain entries therein in their own handwriting giving the facts above set forth, and the registers were offered in connection therewith. Second, entries in the handwriting of a conductor named Lunn, who was ill and unable to attend court, were offered after the books and his handwriting had been proved. Third, the books, after verification and identification were offered as independent evidence.

The evidence of the plaintiff had tended to show that Harvey had exceeded the speed limit over the bridge on train 73 two days before the accident and on train 90 a few days before, and that 73 was his regular train. This made it proper for the defendant to impeach these statements by showing that he was not the engineer of these trains on those occasions, and that 73 was not his regular train. For the latter purpose, it was legitimate to show what trains he was on for a reasonable time before the accident. The registers would, if admitted, sustain the defendant's claim in these respects.

Throughout the discussion we shall treat the registers as properly authenticated and verified in all respects. We shall also assume that the offers were sufficient in form and substance, though various technical criticisms of them are made in plaintiff's brief. At the time, as appears plainly enough, the only objection was to the competency of the books as evidence.

So far as the entries made by the witnesses who testified are concerned, they were admissible as confirmatory evidence, and

were to go to the jury as such. This is the general rule govern-
ing the admissibility of memoranda, and is firmly established in
our decisions. *Stillwell* v. *Farewell,* 64 Vt. 286, 24 Atl. 243;
*Baker & Sons* v. *Sherman,* 71 Vt. 439, 46 Atl. 57; *Jaquith Co.* v.
*Shumway's Est.,* 80 Vt. 556, 69 Atl. 157. Nor was their admis-
sibility affected by the fact that the witnesses, or some of them,
had no independent recollection of the facts recorded. *Davis* v.
*Field,* 56 Vt. 426.

The evidence of the Lunn entries presents a different ques-
tion. These were made by him in the regular course of business,
under the requirements of a rule of the company, and he was,
on account of illness, unavailable as a witness. Had he been
dead, the entries would have been admissible under the holding
in *State* v. *Phair,* 48 Vt. 366, wherein it was said that the rule
laid down was founded in good sense and public convenience.
The subject was again before the court in *Coolidge* v. *Taylor,*
85 Vt. 39, 80 Atl. 1038, wherein certain entries were held to be
inadmissible because the person making them was not called as a
witness or his absence accounted for. But the rule, that regular
entries, contemporaneously made by one who has personal knowl-
edge of the facts, and corroborated by their testimony, if living
and accessible, or by proof of their handwriting if dead, insane
or beyond the reach of process or commission of the court, are
admissible, is approved.

The same question was more recently before the Court. In
*Osborne* v. *Grand Trunk Ry. Co.,* 87 Vt. 104, 88 Atl. 512, certain
hospital records were held to be inadmissible, because the persons
making them were not produced or accounted for. The rule
was recognized, however, and its true foundations pointed out,—
necessity. From which it follows that the rule applies whenever
the entrant is unavailable as a witness. Not only death, insanity
and absence from the jurisdiction, but illness preventing the
attendance of the witness is sufficient. 2 Wig. Ev. §1521.

The offer of these registers as independent evidence presents
still another question. Not being kept by requirement of law
they cannot come in under the rule stated in Stephen's Digest,
Art. 34, recently recognized in *Citizens' Savings Bank etc.* v.
*Fitchburg Mut. Fire Ins. Co.,* 86 Vt. 267, 84 Atl. 970, and more
fully stated and approved in *McKinstry* v. *Collins,* 74 Vt. 147,
52 Atl. 438, and *Ripton* v. *Brandon,* 80 Vt. 234, 67 Atl. 541.
Nor, as independent evidence, can they come in under the memo-

randum rule. But they were made under a rule prescribed under circumstances and for purposes which afford a sufficient guaranty of their accuracy, by persons who had personal knowledge of the facts, and who were without the slightest temptation to falsify. They were contemporaneous. All the circumstances surrounding the making of the entries combine to make their testimonial character of the highest quality. They may properly be denominated quasi-public records. Intentional falsity therein would be purposeless and well-nigh impossible; accidental inaccuracy would be unexpected and infrequent. Matters of the highest importance and gravest consequence, both to persons and property, are unhesitatingly entrusted to railroads, the safety of which depends entirely upon the accuracy and reliability of these records. On principle they should be admitted; and there is a marked tendency to liberalize the rule so that they may be received.

Thus in *Minn. & Dak. Cattle Co.* v. *Chicago & N. W. Ry. Co.*, (Minn.) 122 N. W. 493, it was held that conductor's reports of train movements made in regular course of employment were admissible, especially under the "extremely liberal rules applicable to records kept in regular course of railway management."

The courts have gone further than this, even. In *Fireman's Ins. Co.* v. *Seaboard Air Line Ry.*, (N. C.) 50 S. E. 452, 107 Am. St. Rep. 517, it became important to show at what time a wrecking train reached a certain station on a given day. The train dispatcher produced a train sheet, and testified that he marked thereon the time of the arrival and departure of the train as telegraphed to him by the operator at that station. Upon full discussion, it was held that the document was admissible,—the opinion, according to Prof. Wigmore, being "one of the best" on the subject.

A train sheet was admitted in *Donovan* v. *Boston & Maine Railroad*, (Mass.) 33 N. E. 583. The action was for injuries at a crossing, and the plaintiff's evidence tended to show that he was injured by a train his view of which was obstructed by another train which stood at the station delivering passengers. To show that no train was there delivering passengers at the time the court admitted a train sheet, verified by the dispatcher, and made from telegraphic reports from station operators; and it was held to be competent evidence.

A train sheet was excluded in *Louisville* v. *N. R. R. Co.*, (Ky.) 91 S. W. 691, 3 L. R. A. (N. S.) 1190, and this was held error in an opinion which Prof. Wigmore says is "lucid and forceful."

Nor do we think that it is necessary to the admissibility of such records that they be verified by the person who made them. They stand in this respect like records made by requirement of law; they must be sufficiently identified, and must be shown to have been made in due course of business, and by requirement thereof. So these registers, upon the preliminary showing made, were as much evidence of the facts therein recorded as was the death certificate in *McKinstry* v. *Collins*, 74 Vt. 147, 52 Atl. 438.

A package of letters from DeRosher to Ford, the assistant superintendent, was produced and identified, and Ford testified that he never had any information that Harvey was an incompetent or unsafe driver, and that all the reports of violations of the speed limit over this bridge were in these letters. The letters were offered and excluded. Of this alone the defendant does not now complain, for it does not discuss this exception in the brief. It was in evidence, however, that when Ford received a complaint from DeRosher, he ascertained who the offending engineer was, and reported the matter to a Mr. Hall, the master mechanic, instructing him to take the matter up with the engineer. The defendant offered to show by Ford that he received written reports from Hall, including what the engineers had to say for themselves, and that he had these; and it was claimed that this evidence was admissible on the question of negligence or due care of the company in the matter of unsafe and incompetent engineers. That the defendant was at liberty to show all the facts regarding its method of dealing with this matter cannot be doubted. But it could not show it by these letters. They were not brought within any of the rules of evidence herein referred to; as evidence, they did not differ in character or quality from extra-judicial oral statements from the persons named. Such would be plainly inadmissible.

At the close of the evidence, the defendant moved for a verdict, and now says that this motion should have been granted because there was no evidence tending to show the defendant to have been negligent as charged in the fifth count; because the plaintiff assumed the risk; and because the plaintiff was guilty of contributory negligence.

The evidence fairly and reasonably tended to show that Harvey ran this bridge on at least two occasions prior to the accident, at a rate of speed, which, in view of the conditions there existing, was excessive and dangerous. Without saying that the violation of the rule was negligence, *per se,* (see *Cleveland etc. Ry. Co.* v. *Gossett,* [Ind.] 87 N. E. 723; *Fernette* v. *Pere Marquette R. Co.,* [Mich.] 141 N. W. 1084; *Murphy* v. *Galveston etc. R. Co.,* [Tex.] 101 S. W. 439, 9 L. R. A. [N. S.] 762), the evidence tended to show that he was a careless runner and the question of his incompetency was for the jury. DeRosher, according to the evidence, knew about it; and since, as we have held, he represented the defendant, his knowledge was the company's.

Neither can it be said as a matter of law that the plaintiff assumed the risk. He was entitled to a working place imperiled by trains moving at four miles per hour only. He knew nothing of any faster running. The risk of trains exceeding that speed limit was an extraordinary one, and not assumed, because unknown.

Nor can it be said as a matter of law that the plaintiff failed to show that he was in the exercise of due care. To be sure, he was to watch out for trains; but this requirement referred, as he was justified in understanding, to trains running under the rule. His duties as a laborer were to be attended to. When injured, he was crossing on the ties, an undertaking that required that he give some attention to where he placed his feet. The obstructions to one looking south, the noise of the work, the lack of warning,—all the circumstances together made the question of his due care for the jury. His confusion and misjudgment, if any, does not preclude a recovery. In his emergency, he could not be expected to act with the judgment of a man who has time to deliberate. He did just what the others did; if he made a bad choice, the circumstances tended to excuse him, and it cannot be said that this conclusively cuts out his claim for damages. *Kilpatrick* v. *Grand Trunk Ry. Co.,* 74 Vt. 288, 52 Atl. 531, 93 Am. St. Rep. 887.

Some exceptions were saved to the argument, but as these are not of a decisive character and in view of the reversal required, they are not considered.

It was the former practice of this Court, when a judgment was reversed on exceptions, to treat the whole adjudication as wiped out and remand the case for trial *de novo.* *Kilpatrick* v.

*Grand Trunk Ry. Co.,* 74 Vt. 288. But occasion was taken in *Marshall* v. *Dalton Paper Mills,* 82 Vt. 489, 74 Atl. 108, 24 L. R. A. (N. S.) 128, to put the Court in line with the authorities by adopting a more logical rule; and it was therein held that when the error affected only the question of damages, retrial would be awarded on that question, only. And this holding has been followed since, and has become the settled rule of the Court. *Austin* v. *Langlois,* 83 Vt. 104, 74 Atl. 489; *Kennett* v. *Tudor,* 85 Vt. 190, 81 Atl. 633. The application of the rule depends upon the divisibility of the judgment; and, in a proper case, applies as well when the error affects only the question of liability, —as is shown by the cases. *Robbins* v. *Townsend,* 37 Mass. 345; *Washington Co.* v. *Cramer,* 201 Fed. 878, 120 C. C. A. 216; *Caldwell* v. *Modern Woodmen of America,* (Kan.) 133 Pac. 843; *Haley* v. *Calef,* (R. I.) 67 Atl. 323; *Reynolds* v. *Reynolds,* 15 Conn. 83; *Lisbon* v. *Lyman,* 49 N. H. 553. In making this application of the rule, courts should act with caution; for, as was pointed out in *McBride* v. *Huckins,* (N. H.) 81 Atl. 528, an error may ostensibly relate to one of these questions only, but be of such a character as to have a prejudicial effect on the other; in which case, a full retrial should be awarded. Then, again, cases may arise in which it may appear, from one thing or another, that the assessment on retrial should be changed, one way or the other. To such cases, the rule should not be applied. But in the case before us, no error is found which affects the assessment of damages, and, since counsel (though given the opportunity) make no suggestion that they are unfair, or that any error of the Court or misconduct of counsel affected them, they ought to stand as assessed.

*Judgment reversed and cause remanded for retrial on the question of liability, only, and with directions that, if the verdict therein is for the plaintiff, judgment be rendered for the damages found by the first jury, with interest thereon.*