WALTER FURLONG, ADMINISTRATOR, *vs.* THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY.

Second Judicial District, Norwich, October Term, 1910.
HALL, C. J., PRENTICE, THAYER, RORABACK and WHEELER, JS.

From the refusal of the trial court to set aside the verdict, the defendant seasonably filed an appeal, which contained a request that the evidence be reported "to the Supreme Court of Errors next to be holden at Norwich in the second judicial district on the third Tuesday of October, 1909." *Held* that the words quoted were evidently

Furlong *v.* New York, N. H. & H. R. Co.

intended to designate the court, and the time and place of holding it, to which the appeal itself was taken, and were sufficient for that purpose.

Subsequently, and after the finding was filed, the defendant filed another appeal from the rulings and charge of the court, which was combined with or merged in the former appeal. *Held* that this course was proper, and that the bond given on the original appeal applied to both.

A motion for a new trial for a verdict against evidence, addressed to this court, is irregular.

A railroad company which knowingly permits its trainmen to habitually disregard its rules for protecting stationary trains by flagging those which may be following, is guilty of negligence not only in failing to provide fit and competent employees in its service, but also in the nonperformance of the duty, imposed upon it by law, of using reasonable care to see that such rules are enforced; and is liable in damages to an employee who is injured through such neglect.

Knowledge of a conductor whose duty it is to note and report violations of such rules, and who is authorized to suspend the delinquent trainman for gross misconduct, is the knowledge of the railroad company.

Ordinary care in the retention of fit and competent persons to operate a railroad train, means some kind of practicable inspection or observation of the manner in which such persons perform their duties. That duty may be performed by any duly authorized agent, but in performing it such person represents the corporation and is discharging the master's duty.

The fitness and competency of a fellow-servant may depend as much upon his promptness and willingness to perform his duties as upon his understanding of the duties he is expected to perform.

Argued October 19th—decided December 16th, 1910.

ACTION to recover damages for personal injuries resulting in the death of the plaintiff's intestate and alleged to have been caused by the defendant's negligence, brought to the Superior Court in New London County and tried to the jury before *Case, J.;* verdict and judgment for the plaintiff for $4,000, and appeal by the defendant. *No error.*

In this court the plaintiff and appellee filed a plea in abatement to the defendant's appeal as originally taken and as subsequently amended. *Plea dismissd.*

The decedent, Frank A. Furlong, was on the 10th of

November, 1908, killed by a collision of the defendant's extra work-train No. 1746, upon which he was employed as a brakeman, with the rear end of the defendant's regular way-freight, train No. 994, at Deep River station on the Valley Branch of the Shore Line Division of the defendant's railroad, which branch consists of a single track railroad extending from Hartford south to Saybrook.

The plaintiff claimed to have proved these facts regarding the accident: The extra work-train No. 1746 consisted of an engine, coach and caboose, and had been running on the Valley Branch for several weeks. It carried a conductor, Paige, an engineer and a fireman, two brakemen and many laborers. It worked under a general order which did not fix the time of arrival at or departure from the stations at which it stopped, but required it to keep clear of regular trains. On the day of the accident, as on prior days, it backed in going southerly approaching the Deep River station with the caboose in front, the coach in the middle, and the locomotive in the rear. The conductor, Paige, sat in the cupola of the caboose, acting as pilot, and signaling the engineer with his hands, when necessary, from the window of the cupola, and having at his hand an air valve by which he could control the air brakes. Furlong, the deceased, was also in the caboose. This method of running the train was known to the defendant.

Just north of the Deep River station, which is on the west of the track, the railroad curves sharply to the west and runs through a deep cut obstructing for a time the view of the station and track near it of a person at the front of a train approaching from the north, and also for a time hiding from the view of the engineer of train 1746, any hand signals which could be made from the cupola window of the caboose. There was no signal board at the north end of the cut, nor

any north of the station which could be seen from the front of a train approaching from the north, until it reached a point near the south end of the cut.

When train No. 1746 backed through the cut and around the curve it was coasting, or running upon a down grade by force of gravity and its own momentum. The engine whistle of train 1746 was blown as it approached the Deep River station and shortly thereafter, and when it had passed nearly through the cut, its conductor, Paige, observed the station agent and one D'Arche, a trainman and the flagman of the freight train 994, signaling him to stop. He immediately applied the emergency brake, but the caboose of train 1746 collided with that of the freight train 994, which was standing near the Deep River station, with such force that both were demolished, and Furlong was killed.

The crew of the freight train 994 consisted of an engineer and fireman, a conductor (Mitchell) and four trainmen, one of whom (D'Arche) had for nearly three months been acting as flagman, and had been in the defendant's employ as brakeman or flagman for a number of years. Coming south on that day the train 994 passed the work-train No. 1746 as it stood upon a siding some eight miles north of the Deep River station. The freight train 994 was forty minutes behind its schedule time when it arrived at Deep River on that day. The engine and some of the freight cars were detached and run further south for switching. Two of the four trainmen rode away upon the engine, and the other two trainmen, one of whom was D'Arche, whose duty it was to flag approaching trains, went with the conductor, Mitchell, to the freight house, where they and the station agent, Kane, proceeded to handle the freight, leaving the rear portion of the freight train standing upon the main track. No one went back

from train 994 to flag or warn any train approaching from the north, until the trainmen of No. 994, while so engaged in handling the freight, heard the whistle of the approaching No. 1746, when D'Arche and the station agent ran out and attempted unsuccessfully to stop it, as above stated.

Rule 99 of the defendant railroad contained this provision, which was well known to conductor Mitchell and to D'Arche and other conductors and flagmen in the defendant's employ: "When a train stops or is delayed under circumstances in which it may be overtaken by a following train, or needs protection, flagman must go back immediately, with danger signals, a sufficient distance to insure protection. . . ."

Rules for government of conductors provided, among other things, that they would be responsible for the "faithful and prompt performance of duties by the trainman;" that they must report all violations of rules and neglect of duties by the train employees, to the superintendent; that in case of gross misconduct they might relieve the offending employee for the rest of the trip; that they should see "that the train is supplied with a full set of signals and that they are displayed in accordance with the rules."

It was the custom of D'Arche, when the train upon which he was acting as flagman stopped at a station, to signal all regular time-table trains, and all other trains of the approach of which from back of his train he received actual notice from the bulletin board at the station, or from the station agent or telegraph operator, that an extra train was expected. He received no such notice at the time in question, and no regular time-table train was then due. Conductor Mitchell knew of such custom of D'Arche regarding the flagging of approaching trains, but never censured or reported him for failure to properly flag trains.

The defendant claimed to have proved, among other things, that both Mitchell and D'Arche were competent men in their respective positions; that they were familiar with the printed rules of the railroad, and understood their duties under them; that it had not been the custom of D'Arche to disregard Rule 99, and that any violations of said rule by D'Arche were not known to any official of the railroad or to conductor Mitchell, except upon the day when this collision occurred, and that the defendant had exercised reasonable care to provide fit and competent workmen and to see that the rules of the company were enforced.

The verdict for plaintiff was rendered June 16th, 1909, and the defendant on that day filed a motion to set it aside, which was denied June 30th, which is the date of the judgment-file.

On July 2d the defendant filed a notice of appeal from the judgment, and on the same day filed a motion for a new trial for verdict against evidence, addressed to this court at its term in Norwich on the third Tuesday of October, 1909, and also on July 2d filed an appeal from the denial of its motion to set aside the verdict, as follows: "And now the defendant, within six days after judgment in said cause, appeals from the refusal of the trial court to set aside the verdict and moves for a new trial of said cause upon the ground that the verdict is against the evidence in the case; and further moves that the court report the evidence to the Supreme Court of Errors next to be holden at Norwich in the Second Judicial District on the third Tuesday of October, 1909, and make such evidence a part of the record and transmit said record to said court for the determination and judgment of that court." A sufficient bond to prosecute was given when said appeal was filed, and the appeal was allowed July 3d, 1909.

The finding of facts in this case was filed April 19th,

1910, and on April 28th the defendant filed an "Amended Appeal" to this court at its October session in Norwich on the third Tuesday of October, 1910, stating therein that it thereby amended the appeal of July 3d, and took such appeal for the revision of the errors alleged to have occurred during the trial, and of the question whether the court erred in refusing to set aside the verdict; and requested in such appeal that the court report the evidence to this court for the purpose of correcting the finding, and also for considering whether the court erred in refusing to set aside the verdict. This appeal assigns numerous errors alleged to have occurred during the trial, and also assigns as a reason of appeal that the court erred in refusing to set aside the verdict. No bond was given with this appeal.

The plaintiff pleaded in abatement, in this court, to the appeal of July 3d, 1909, upon the ground that it did not describe the court to which it was taken; and to the appeal of April 28th, 1910, upon the ground that no bond to prosecute the appeal was given with it. The defendant demurred to these pleas in abatement.

*Joseph F. Berry*, for the appellant (defendant).

*Hadlai A. Hull* and *C. Hadlai Hull*, for the appellee (plaintiff).

HALL, C. J. The pleas in abatement to the two appeals to this court, afterward united in one by amendment, are dismissed. The words in the appeal of July 3d, 1909, describing the court, and the time and place of holding it, to which it was asked that the evidence be reported, were evidently intended to apply also to the appeal, and to describe the court and the time and place of holding it, to which the appeal was taken. This

description was sufficient to permit the appeal of April 28th, 1910, to be joined with that of July 3d, by amendment. *Stillman* v. *Thompson,* 80 Conn. 192, 194, 67 Atl. 528. The two appeals having been thus properly joined in one, it was unnecessary to give a second bond to prosecute, when the amended appeal of April 28th, 1910, was filed. The bond given July 3d, 1909, became, by the amendment joining the two appeals, applicable to both. The motion of July 2d for a new trial, addressed to this court, was irregular.

Turning to the appeal itself, we find that many of the questions raised by the defendant in the trial court, and some of which are repeated in the reasons of appeal, were practically eliminated by the charge of the court respecting them, favorable to the defendant, and by the evidence regarding them which we have before us. Indeed, we think the record before us shows that the controlling questions upon this appeal are those arising upon but one or two of the grounds of negligence alleged in the complaint, and from the action and rulings of the trial court regarding them, in its charge to the jury and its refusal to set aside the verdict as against the evidence.

The alleged grounds of negligence from which most, if not all, of such questions arise, are, in substance, these: that the flagman of the freight train (D'Arche) had not for many months before the accident gone back to give proper signals to approaching trains when the freight train was so standing upon the main track; that the "defendant company negligently employed and continued to employ said flagman (D'Arche), who was on said day and for many months prior thereto had been so negligent as aforesaid, in failing to give signals as aforesaid;" that the defendant was negligent in failing to inspect the method of giving the signals required by the rules, and "in allowing and permitting

said flagman (D'Arche) to continue to neglect to give proper signals to approaching trains." . . .

The court very properly told the jury that it was clear that D'Arche neglected to go back with his flag, and that his failure to do so was one factor in the accident; but that D'Arche was a fellow-servant of Furlong, and that therefore the plaintiff could not recover for an injury to Furlong caused by D'Arche's negligence only.

Concerning the liability of the defendant for its own alleged negligence, as above stated, the court said to the jury that it was charged that "this conduct of D'Arche (in disregarding Rule 99) was his habitual conduct . . . consistently practiced by him, recognized by his associates, and tolerated and acquiesced in by the company;" that there was conflicting testimony upon that point; that isolated violations of the rule were not enough to establish such an acquiescence by the company as amounted to an abrogation of the rule; but that it must appear that "the violations were persistent enough to be chargeable to the knowledge of a reasonably vigilant master, and that the master's conduct was such as to tolerate or encourage a continuance of them, to fasten upon the company responsibility for such a practice." The court further charged the jury upon this point as follows: "If D'Arche's conduct on the day in question was his habitual method long enough and persistently enough practiced by him to impute knowledge of it and an acquiescence in its continuance by the defendant, then the negligence of the defendant is established, and it is liable if that negligence directly caused the injury. On this feature of the case, therefore, I charge you that any knowledge of the conductor, Mitchell, of the freight train of prior and persistent and habitual violations of the rules—if such there were—would be chargeable to his superior, the defendant itself."

The two questions raised by the appeal respecting these instructions given by the trial court, are: (1) Were they correct statements of the law?    (2) Was the evidence such as justified the court in submitting to the jury the questions of fact involved in these propositions of law, and in refusing to set aside the verdict of the jury in favor of the plaintiff?

This is an action against an employer by the representative of a deceased employee.    Clearly, under the fellow-servant law, the mere negligence of Furlong's colaborer, D'Arche, to carry back the signal flag, did not render the employer liable for the injury thereby caused to Furlong.  *Whittlesey* v. *New York, N. H. & H. R. Co.*, 77 Conn. 100, 58 Atl. 459.  In order to hold the defendant responsible for Furlong's injury, the plaintiff was required to prove that the railroad company had violated some duty which it owed to its employees.    One rule, firmly established by law, growing out of the relation of master and servant, or employer and employee, is that the former shall exercise reasonable care to provide "fit and competent" persons as colaborers of his employees.  *McElligott* v. *Randolph*, 61 Conn. 157, 161, 22 Atl. 1094.  The duty of the employer to so endeavor to provide "fit and competent" colaborers for his employees, is not necessarily fully performed by exercising reasonable care in the original selection and employment of his servants.  The master who continues in his service with his other employees, one who is unfit or incompetent to engage in such employment with others, as the master has learned, may properly be regarded as careless in endeavoring to provide fit and competent persons to work with others, as one who originally employs such a co-workman with knowledge of his unfitness.  Ordinary care in providing fit and competent servants, means ordinary care in the retention as well as in the selection of fit and competent

servants. 12 Amer. & Eng. Ency. of Law (2d. Ed.) p. 915; *Coppins* v. *New York C. & H. R. R. Co.*, 122 N. Y. 557, 25 N. E. 915; *Gilman* v. *Eastern R. Co.*, 13 Allen (Mass.) 433; *Brookside Coal Mining Co.* v. *Dolph*, 101 Ill. App. 169. Ordinary care in the retention of fit and competent persons to operate a railroad train, means some kind of observation of the manner in which such persons perform their duties, if some kind of observation is practicable. The law only requires the employer to act reasonably. It does not compel the directors or high officials of a corporation to themselves perform the work of selecting and hiring its employees. That duty may be performed by any duly authorized suitable person, but in performing it such person represents the corporation, and is performing the employer's duty. It would seem to be no more difficult for a railroad company to authorize a suitable person to act in its behalf in observing how trainmen performed their work, than to authorize one to act for it in the selection and employment of trainmen.

Again, the words "fit and competent persons," mean something more than skilful and experienced persons. Carefulness and faithfulness are often more essential elements of fitness and competency in an employee than experience and skill. The fitness and competency of a fellow-servant may depend as much upon his promptness and willingness to perform his duties as upon his understanding of the duties he is expected to perform. In selecting and retaining in its employ trainmen, a railroad company should select and retain only *reliable* men. *Coppins* v. *New York C. & H. R. R. Co.*, 122 N. Y. 557, 25 N. E. 915. A railroad company that knowingly employs a reckless or careless trainman to discharge duties, the negligent performance of which may endanger the lives of his fellow-workmen, or that continues such person in its service after actual

or constructive knowledge of his habitual violation of a rule so important as that requiring him in stated situations to go back with a flag to signal possibly approaching trains, has not only failed to provide fit and competent persons to be colaborers with its other workmen, who may be injured by such negligence, but has failed to perform the duty imposed upon it by law (*Nolan* v. *New York, N. H. & H. R. Co.*, 70 Conn. 159, 194, 39 Atl. 115) to use reasonable care to see that its rules for the protection of person and life are enforced. Such company would not, under the fellow-servant rule, be entitled to exemption from liability for an injury to one of its employees caused by such negligent failure of the trainman to perform his duty.

But it is said that the evidence fails to show that the company knew of D'Arche's delinquencies, and that the court erred in charging the jury that the knowledge of Mitchell, the conductor, was chargeable to the defendant. We are not prepared to say that the jury might not properly have found from the evidence that D'Arche had so long and openly violated Rule 99 that the company was chargeable with knowledge of his negligence. But, as we have pointed out, the duty of the employer to provide fit and competent colaborers for his employees, is not ended by the act of selecting and hiring them. The employer continues to provide the colaborers so long as they continue to work under his employment. Less watchfulness and oversight may be required of the employer over the conduct of such workmen as have been carefully selected at the time of their original employment, but it still remains at all times a duty which the master owes to his servant, to exercise reasonable care to provide as his colaborers persons who can and will perform those duties which they are employed to perform, and the failure to perform which may endanger the lives of their fellow-

workmen.  He who performs the duty of seeing that the employees of a railroad company are not negligent or incompetent is, in that respect, performing a duty which the master owes the servant, and his failure to properly perform it is the negligence of the master.  *Rincicotti* v. *O'Brien Contracting Co.*, 77 Conn. 617, 60 Atl. 115.

The conductor, Mitchell, was required to perform that duty of the master.  The rules of the company required him to note and report to the superintendent "all violations of rules and neglect of duty by the train employees," and authorized him in certain cases to suspend the delinquent.  Evidently one of the reasons of requiring him to perform this duty was to enable the company to learn who of its employees were competent and reliable persons to be continued in their employ.  In the performance of that duty—although in other respects he may have been—Mitchell was not a fellow-servant of Furlong, but a representative of the company (*Brennan* v. *Berlin Iron Bridge Co.*, 74 Conn. 382, 389, 50 Atl. 1030), and, as such, his knowledge of D'Arche's disregard of the rules was therefore the company's knowledge.  *O'Neil* v. *Keokuk & D. M. R. Co.*, 45 Iowa, 546; *Brookside Coal Mining Co.* v. *Dolph*, 101 Ill. App. 169.  With such knowledge of an habitual violation of Rule 99 the defendant was negligent at least in continuing D'Arche, if not in continuing Mitchell, in its service.  There is no error in the charge of the trial court to the jury.

The trial court committed no error in refusing to direct a verdict for the defendant, nor in denying the defendant's motion to set aside the verdict as against the evidence.  It is impracticable to recite here the evidence which, in our opinion, showed that the defendant was not entitled to exemption under the fellow-servant law and justified the verdict rendered.  Upon a perusal of it we think the jury were warranted in

finding that D'Arche was negligent in not carrying back the flag to signal train 1746; that in that respect he had habitually violated Rule 99; that Mitchell, as representing the company, with knowledge of such violations of Rule 99, negligently failed to perform the duty imposed upon him, and that the defendant was therefore negligent as alleged in the complaint.

Neither the rulings upon evidence, nor other parts of the charge complained of, furnish grounds for a new trial, and we deem it unnecessary to discuss them.

There is no error.

In this opinion the other judges concurred.