Anna Rosche, Administratrix, Appellant, v. Bettendorf Axle Company, Appellee.

APPEAL AND ERROR:  New Trial—Weight of Testimony—Error
1  of Court—Discretion.  Even though it be determined on appeal that the trial court was in error in its judgment that the record did not furnish sufficient evidence to carry the case to the jury on the particular negligent act charged, yet its order for a new trial will not be disturbed when the lower court was of the opinion that its own error in failing to limit the application of

certain material evidence was probably prejudicial. Such action is clearly within the discretion lodged in the trial court.

**MASTER AND SERVANT:** Incompetent Fellow Servant—Evidence 2, 4 **to Show—Disobedience to Orders—Negligence.** On the question of the competency of a fellow servant, his disposition to disobey orders is material.

**MASTER AND SERVANT:** Negligence—Incompetent Fellow Servant—Sufficiency of Evidence. The employment of an incompetent person, the retention of such employee in the work, knowing of his incompetency, with added failure to properly instruct such employee as to his work, may fasten liability upon the master.

PRINCIPLE APPLIED: A girder weighing many tons, with 12-inch flange on each side, had been lowered to a level and solid floor by an electric crane. The hooks grappling each side of the flange were removed by the foreman or deceased, and hung practically motionless on the north side of girder; possibly one of the hooks was yet fast to the flange. The crane was of no farther use and it was necessary to move it out of the way of the workmen. The craneman was in a cage 20 feet above the floor where he could see the girder and the men below. The proper way to remove the crane was to move it away from the girders and then raise the hooks. Under some circumstances, persons other than the foreman gave signals to the craneman; but the foreman testified he was the only one who gave signals on this heavy lifting, and that it was the craneman's duty to watch and obey the foreman's signals. The foreman signaled to the craneman "to move the crane north and away from the girder." There was testimony that this was the only signal given. The craneman testified that he saw this signal, but that the deceased also gave a signal "to raise the hooks," and he raised the hooks with the result that they caught in the flange, overturned the girder and killed deceased. The craneman knew it was his duty to see that the hooks did not catch in anything. There was testimony that the men on the floor were inexperienced, this heavy work being materially different from that which they had been accustomed to do.

The craneman was twenty-one years old, had worked on the farm at common labor, gone to business school, done clerical work, and had two or three weeks' training as a craneman by being under other cranemen and watching and observing them in operating the crane, and in receiving instructions from them, they being younger in years than the craneman in question. The craneman claimed he understood the operation of the crane, had no trouble in operating it or in judging of distance or in'

understanding signals. The chief electrician did not take crane-men up into the cage and explain the mechanism, but explained it to them and cautioned them as to what to do and what to avoid. The day deceased was killed was the first day he had handled very heavy material. Several complaints had come to the foreman prior to the day in question that this craneman was slow, incompetent, and did not understand the work, and some employees had asked for an older man in the crane cage. The foreman made complaint at headquarters and was promised a more experienced man. There was testimony that this crane-man was competent "if the men on the floor govern themselves." Witnesses familiar with the handling of cranes testified that the craneman in question was not competent. Others testified he was competent. There was testimony that he did not have the experience sufficient to distinguish between a proper and im-proper signal and was disposed to disobey orders. He himself stated that the foreman gave him an order to move the crane "to one side" and he did not recall whether he had obeyed the order or not. The mechanism and surroundings of the crane were some-what complicated and required attention from the craneman. *Held,* the incompetency of the craneman was for the jury.

**MASTER AND SERVANT:** Contributory Negligence. Evidence re-viewed and held insufficient to show contributory negligence *per se* on the part of an inexperienced employee in giving a signal for the hoisting of the grappling hooks of a crane.

**MASTER AND SERVANT:** Proximate Cause—Jury Question. Prox-imate cause is generally a question for the jury.

*Appeal from Scott District Court.*—HON. A. J. HOUSE, Judge.

TUESDAY, JANUARY 19, 1915.

ACTION by plaintiff as administratrix to recover damages for the death of her husband because of the alleged negligence of defendant in employment of one Lemon as crane man. There was a trial to a jury and a verdict for plaintiff. The motion for a new trial by defendant was sustained, and the plaintiff appeals.—*Affirmed.*

*Ely & Bush,* for appellant.

*Cook & Balluff,* for appellee.

PRESTON, J.—The petition alleged that the injuries to plaintiff's intestate are due to defendant's negligence in employing an unskilled, inexperienced and incompetent person, one Lemon, to operate a large, electric traveling crane, and negligently failing to instruct him as to the proper methods and dangers of handling the crane. Another ground of negligence was alleged, but there was no evidence introduced to sustain such other ground, and that question was not submitted to the jury. We do not understand appellant to complain of that.

At the close of plaintiff's evidence, defendant moved for a directed verdict, and again at the close of all the evidence, on a number of grounds, which motions were overruled, and the case was submitted to the jury. There was a verdict for plaintiff, and defendant's motion for new trial was sustained. In its ruling, the court states that the motion was submitted without argument. The court seems to have been of the opinion, and so stated in ruling on the motion, that the evidence was not sufficient to show that defendant failed to exercise reasonable care to furnish a competent fellow servant for deceased, but that there was an abundance of evidence to the effect that some of the officers of defendant were notified that Lemon was careless and to the effect that he was not suitable for the work in hand; that this could not be considered in determining that he was so in fact; that no express instruction was asked or given directing the jury as to how such testimony should be applied; and that, under such circumstances, it may well be that the jury were influenced by considering such testimony in passing upon the question of the competency of Lemon; that complaints or reputation may show notice of incompetency, if it exists, but incompetency, in fact, cannot be inferred therefrom. The motion was sustained apparently upon these grounds, but the other grounds of the motion were not expressly overruled.

The setting aside of a verdict and ordering a new trial is a matter within the discretion of the trial court, and this

court will not interfere with such an order unless it appears
that there has been an abuse of legal discre-

1. APPEAL AND
ERROR: new
trial: weight
of testimony:
error of
court: discre-
tion.

tion. *Stewart v. Railway,* 136 Iowa 182; *Arc-
tic Refrigerator Co. v. Kelly,* 95 Iowa 189;
*Chambliss v. Hass,* 125 Iowa 484; *Armstrong
v. Stewart,* 130 Iowa 162; *Van Wagenen v.
Parsons,* 106 Iowa 263. So that, if in this case the trial court
was of opinion that the jury may have been misled because
of the failure to instruct upon the point above indicated and
thought such failure was prejudicial, it was clearly within the
discretion of the court to grant a new trial for that reason.
This being so, we ought not to interfere with the order grant-
ing the new trial. This is the main point involved upon this
appeal.

Appellant insists that the court abused its discretion
because the evidence was sufficient to show that Lemon was
incompetent, and that the defendant was negligent in employ-
ing and continuing him in its service, but does not argue the
question suggested by the court that the jury were not prop-
erly instructed. Whether it is necessary to show notice or
knowledge has not been argued. In view of a retrial we feel
it our duty to determine whether there was evidence enough
to go to the jury on the question of the alleged incompetency
of Lemon. We are of the opinion that the evidence on this
branch of the case was enough to take the case to the jury.

Counsel for appellee contend that the only evidence of-
fered by plaintiff to sustain the claim that Lemon was incom-
petent was the evidence of Burr and Pilcher. Their testimony
will be referred to later. While, for appel-

2,4. MASTER AND
SERVANT: in-
competent
fellow serv-
ant: evi-
dence to
show: dis-
obedience to
orders: negli-
gence.

lant, it is contended that there are other cir-
cumstances which may properly be considered
as bearing upon this question, the rule is that
bodily and mental infirmities, the disposition
with which the employee performs his duties,
his age, experience and the like, as well as prior acts of negli-
gence, may be considered. 3 Labatt's M. & S., Secs. 1083-
1090.

Appellant contends that the instructions given to Lemon were in issue and were included in the charges of incompetence and inexperience. In 3 Labatt's M. & S., Sec. 1150, it is said: "In most cases the injury which is inflicted by breach of the duty to instruct was received by the servant who ought to have been instructed. But it is clear that, if the injury was due to the fact that a fellow servant was not fit for his position, owing to the want of proper instruction, the master may be held responsible," citing *Lebbering v. Struthers*, 157 Pa. 312 (27 Atl. 720).

The following cases are cited by appellant upon the question as to what incompetency will render an employer liable, and the duty of the employer in hiring. *Consolidated Coal Co. v. Seniger*, 179 Ill. 370; *Maitland v. Co.*, 97 Wis. 476; *Hamann v. Co.*, 127 Wis. 550; *Furlong v. Ry. Co.*, 83 Conn. 568; *Scott v. Co.*, 126 Iowa 524; *McElligott v. Randolph*, 61 Conn. 157 (22 Atl. 1094); *Coppins v. Co.*, 122 N. Y. 557 (25 N. E. 915); *Rincicotti v. Co.*, 77 Conn. 617 (69 L. R. A. 936); *Walkowski v. Mines*, 115 Mich. 629; *1 Labatt's M. & S.* (1st Ed.), Sec. 194; *Kroy v. Railway*, 32 Iowa 357; *Smith v. Railway*, 48 L. R. A. 368, 373, and Note; *Still v. Co.*, 20 L. R. A. (N. S.) 322, and others.

See also Robbins v. Street Railway, 30 L. R. A. (N. S.) 109, and Note; *Hunt v. Ry.*, 160 Iowa 722.

Counsel for appellee state that they are willing to concede that the law is as stated in appellant's brief, but they say that some of the cited cases are not applicable to the case at bar.

The principal point argued as to the merits of the case is as to whether the evidence was sufficient to take the case to the jury on the question of the alleged incompetency of Lemon. Under the circumstances, perhaps we should set out some of the testimony bearing upon this point, and, to some extent, upon other points argued.

**3. MASTER AND SERVANT: negligence: incompetent fellow servant: sufficiency of evidence.**

The deceased was injured October 11, 1912, and died

soon after from his injuries. At this time, the defendant was engaged in putting up an extension to its foundry, the frame work of which was composed of structural iron and included certain girders about forty feet long and forty-one inches high, with twelve-inch flanges. Each girder weighed several tons. The material for this extension was being gotten out in what is called the main erecting shop, which was a building twenty-one hundred feet long, and was carried by large electric cranes running east and west approximately twenty-one hundred feet, and having a lateral movement of the full width of the bay, about seventy feet. In moving the girder, it was attached to the crane with a pair of hooks which were attached to the cable block, and hooked over the flange of the girder, one on each side. The upper ends of the hooks were fastened to a ring about eight inches in diameter, or perhaps a short lead chain between the hooks and the rings. The block, or pulley, was suspended from a trolley by three or four loops of wire cable. The crane man stays in the cage when operating the crane. This cage is up underneath the crane girder, about twenty feet from the floor. The girder being moved at the time deceased was hurt had been picked up about thirty feet from where it was set down and deceased hurt; while it was being carried along, it was about three feet above the floor or pavement. The brick pavement was smooth, level and solid. When the crane stopped, the girder was lowered to the pavement. The girder came to a complete rest on the pavement.

There is some dispute in the testimony as to who unhooked the hooks from the beam. The foreman, Burr, testified that he did this and placed the hooks on the north side of the girder. Others think the deceased unhooked them. At that time, the crane was standing still. The foreman testifies that, after he loosened the hooks and placed them on the north side of the girder, he signaled the crane man to move the crane north, and away from the girder; but Lemon, the crane man, did not obey the signal. Before the signal to move side-

ways was given, both the hooks were hanging down on one side of the girder. Lemon testifies that the deceased gave a signal to raise the hooks; but other witnesses testify that deceased did not give any signal, and that there was no signal given except the one to pull the crane sideways. When the hooks were raised, they caught in the flange of the girder and pulled it over to the south upon deceased. Just before deceased was hurt, Burr, the foreman, was on the north side of the girder, and deceased on the south. One other witness was present and another some distance away. Witnesses say the hooks were not swinging after they were taken off the girder, but were hanging still, although some of the witnesses say they are not sure but that the cables and hooks were swinging slightly. By leaning over a rail, Lemon, in the cage, could look down and see the girder and see the block. The foreman, Burr, testifies that in order to get the signals he had to be watching, and that he (Burr) was standing where Lemon could see him; that he (Burr) was the man giving the signals, and that it was Lemon's business to watch and obey Burr's signals. He says that after he gave the signal to move the crane north he walked away, and at that time deceased was standing southeast of him on the other side of the girder; that, as he gave the signal, one of the men came to him and called his attention to some other work; that when he looked back the girder was tipped over; that he then went over to the girder, and the hooks were four to six feet higher than when he had signaled Lemon to move north; that Lemon had raised the hooks, and Burr says that he did not give any signal to raise the hooks. The testimony is that, under some circumstances, others than Burr gave signals to the crane man, but Burr testifies that he is the only one who gave Lemon signals on heavy lifting of that kind. The next step in the work, after the hooks were removed from the girder, would be to pick it up with an electric hoist; as soon as the hooks were removed, they were through with the large crane, and it was the crane man's business to move it to some other place,

and, in doing this, it was the duty of the crane man to move the block up where it would clear men and objects in the shop. But, according to the testimony of some of the witnesses, the hooks should have been moved north, or away from the girder, before being raised. Lemon testifies that deceased loosened the hooks and then gave a signal which indicated up, and that he took the signal and turned and went to raise his hooks and gave them a slight raise, and he heard deceased yell.

At the time deceased was injured, the work was in charge of Burr as foreman of the structural work. The work in which they were then engaged was an altogether different kind of work from what they generally did at the plant; Lemon had never had anything to do with handling cranes until employed by the defendant; he was about twenty-one years of age at the time of this transaction; he went to school until he was fourteen years old, then he worked on a farm at ordinary farm work until he was twenty; in this work he handled ordinary farm implements; he then went to town and worked on a contract job for about two months, then went back to the farm for a few months, and after that worked at wheeling ashes until the spring of 1911. In May, 1911, he took a business college course, completing the course in June, 1912; worked at the school as fireman and assisted the engineer for about two months, and during that time did some teaming; after that, worked about two months in Chicago as a railroad clerk, and came to Davenport September 13, 1912, and secured employment with defendant company. He was put to work as a crane student under Winegar, a young man who was nineteen years of age at the time of the trial, in April, 1913. Lemon testifies that he was with Winegar the first two or three days; that he watched Winegar take and lift loads, watched him operate the crane and learned to distance and learned the signals; that after the first two or three days he took and carried chains back and forward, and after that Winegar allowed him to lift every now and then a load for a few days; that he was under Winegar about a week and a half, and then was

placed with Sparks, a young man who, at the time of the trial, was past nineteen. Lemon says he was with Sparks a week or better, couldn't state exactly, and then he was left in the same crane by himself and operated the crane; says he understood the manner and means of controlling it, and could handle it first rate, and he says he had no difficulty in understanding or following signals. He says that October 11, 1912, the day deceased was hurt, is the first day he had handled any of those large girders; previous to that he had carried smaller articles; that he began to handle material for this gang about a week before October 11th. He says that, previous to the time he claims deceased gave him a signal to raise the crane, Burr, the foreman, had given him a signal to move his carriage north, but whether he obeyed Burr's order he couldn't say; he does not remember. He says that he had to watch the live wire, and also watch the blocks so they would not catch into the frame and tear off the track off the smaller hoist. He says that it was his business to watch the hooks and to take care of them in such a way that they would not catch in anything. He testifies that Burr gave the signal to move the crane north before deceased gave the signal to raise up, and then he says that he does not think he moved the crane north after Burr gave the signal before he obeyed the signal of deceased and raised the hooks.

Appellee states in argument that the manner of handling an electric crane is not one within common knowledge, and that neither counsel nor jury can be presumed to know what the difficulties of handling the crane are, and that the danger of tipping the girder over by lifting the hooks while in proximity to it was perfectly apparent to anybody. Under all the circumstances of the case, we think it was a question for the jury to say whether the danger of the hooks catching the girder and upsetting it was apparent, taking into consideration the size, nature and position of the girder, the position of the cage and the crane man, the description of the hooks, the manner in which they were suspended by the wire cables,

the electric wires and the small crane frame, which the crane man had to avoid and which, to some extent at least, would take his attention, the fact that the work then in hand was different from what the crane man had been engaged in, and the other circumstances shown.

Burr, the foreman, who was in the employ of the defendant, but called as a witness by plaintiff, testified that there is not a crane man in the shop that has any experience in the kind of work then being done.. From this, it is argued by appellant that Lemon had not been instructed in regard to handling such a girder and the danger of one of the hooks catching on it, because there was no one to instruct him in such matters; that he never handled any object which was likely to cause injury by being tipped over, and that the danger of the hooks catching and tipping anything which had been moved by the crane and released was not called to his attention and was not in his mind, and, to that extent, he was necessarily inexperienced and incompetent. Burr testifies further: The requirements in handling the crane were altogether different in handling the girder from what they had been doing with that crane. The nature of the difference was that it was heavier work, and a great deal longer, and you had to be pretty careful about handling them. He also says:

"I stayed there myself to keep from that; that is, to keep safety, or careful handling. While I was there, actually present, I gave the crane man signals as to how to move those girders and stuff of that kind. The work of the crane man was certainly materially different from what it was in working in the car shops; that is the reason I stayed right there.

Q. "Now I wish you would tell the jury whether or not, before this accident happened, any complaints came to you from the employees with reference to Lemon.

A. "There certainly was. There were several times the men would say he was slow and he didn't understand some of that work.

''I reported to the assistant electrician in charge of the crane work in the car shop in regard to these complaints. I asked him if he had an older man to put on the crane. 'If you can, I would rather you would put on the oldest man you have got for this kind of work because I can't keep away from here at all and go up to the other work.' He said that is the only man he had and he would fix me out later; that was about three days before this accident. At the time the accident happened he had not fixed me out. A few days before Rosche was hurt Hoffman came to me and told me that this here kid didn't understand that work, and that is when I went to see if we couldn't get an older crane man. Lemon was a green man in that work. When I asked for an older man I told the assistant Lemon was slow and hadn't been used to any such work as that. I told him that I couldn't very well stay around with one gang all the time and that I wanted an old man so that I could go away from there. Lemon was all right at his own work, but on work of this kind it was altogether new. I have heard Pilcher 'cuss' Lemon for being careless in the way he handled the crane, once several days before Rosche was hurt. Before Rosche was hurt some of the men asked me if I couldn't get an older man on that crane; that Lemon was slow and he didn't really understand that work. When I was there there was no complaints because I done all that lifting. He was all right for me, but he wasn't for them, because they were greener than the crane man. Lemon was green, and so were the men below, one as bad as the other; you had to watch them all. In doing the work they were engaged in, moving this girder after the hooks were cast off, there was no occasion at that time for raising the hooks up.

Q. ''From your knowledge of the business of handling cranes, and your observation of the way Lemon did his work, and the appearance of his work as he did it, taking into consideration the kind of work which was being done, the men that were working with you in handling that material, tell the jury whether or not Lemon appeared to be a competent

crane man to do that kind of work with that kind of material and that kind of men on the floor, whether he appeared to be a competent man.

A. "Well, that is a kind of hard one to answer because, as I said before, I won't answer yes or no. It is a question that one side is as bad as the other. The men below were awkward, and the man above was a new man. Of course, he didn't know any more than the men below; one was as bad as the other. He would have been with a well experienced man round him. I was there at that time. I would not say this man was not capable of running that crane entirely.

Q. "You are a crane man and accustomed to handling cranes and seeing them handled?

A. "Yes, sir.

Q. "You told all about these men being green; that is all in the record over and again?

A. "Yes, sir.

Q. "Now I am asking you to take into consideration the fact that these men were green men on the floor and that this fellow handled the crane in the way you said he handled it, among these green men, from the appearance you say there, I want you to tell this jury whether or not you think this man Lemon was a competent man to handle that crane in that kind of work among those green men on the floor; whether it appeared to you that he was capable to do it, a competent man?

A. "Well, I tell you, that is a hard one to answer because there is a good many ways of answering it.

Q. "Considering all those elements, I will ask you whether or not he appeared to be a competent man to handle that kind of work among that kind of men on the floor?

A. "Well, I tell you, by governing themselves, he really was; he was all right, yes.

Q. "Among good men?

A. "Among good men, yes, if they would govern themselves.

Q. "Among the men that you had there on the floor, and doing this kind of work, I want to ask you whether he appeared to be?

A. "By guarding themselves, he was all right, another way he was not all right, that is the only way you can fix it. I wouldn't condemn the man because one was as bad as the other.

Q. "I am not asking you to condemn him, but whether he appeared to you to be a competent man to do that work.

A. "Well, I have answered about as well as I can I think. I wouldn't come out and say absolutely he was dangerous in among that bunch of men. He wasn't extra good at judging distances in handling heavy material.

Q. "Is it not true that you told me not ten minutes ago in the ante room that you would have to answer that he was incompetent.

A. "I said I wouldn't answer that question; I couldn't answer that yes or no.

"Some of the men complained to me about Lemon being slow and ugly about taking signals. They did not complain so much about his misunderstanding signals. I don't know as I heard any complaint about his being really reckless, running the crane fast, or drop a load, or anything of that kind. That was not the worst trouble. The complaint was mostly from him being mouthy. When the men would get after him about lifting loads he would talk back to them. At the time I made the report to the assistant I went down after the crane and the crane man was standing down about the middle way of the bay doing nothing any more than he might have been rolling a cigarette. I wanted him to come up and give us a lift. He said he didn't have to. I spoke a few wild words, and he did back, so that caused a little trouble, and I went to the assistant. That was mostly the whole complaint I made. The man was really all right when I was there, or when proper signals was given. When I said this morning that the crane man was green and the men on the floor were green, I meant

that if the men on the floor gave an improper signal the crane man did not have experience enough to know it was an improper signal. You could not call him careless; you can't really call it careless; I can't explain it. Hoffman came to me and says, 'Can't we get an older crane man? This man don't understand picking up these here girders.' I says, 'Why?' He says, 'He picks them up and he lets them swing.' Well I couldn't say that I heard them say that he was really careless. I told the assistant that the men complained about Lemon being too careless and didn't want to work under him. The men didn't tell me that.''

Some of the evidence of this witness which we have set out was given on cross-examination. He was examined at length, both on cross-examination, re-examination, and re-cross-examination. We have set out more of his testimony than we intended.

Pilcher testified that he had been employed by defendant, following a crane, from the first of September up to the time Rosche was killed; that he had had experience in handling a crane and was familiar with the proper methods of handling cranes for three and a half years. He testified further:

''When this accident happened I was thirty feet, about, from it. I saw the crane when it was down on top of the man and saw the crane when they were hitching onto it. The man lost his head and took him four or five minutes to lift it. I followed the crane while Lemon was acting as crane man from four to six weeks, and he didn't act right. He appeared, all right, a nice, good boy, and clean, and everything, but he wasn't smart or bright, he ought to be in a cornfield, not up there in the crane. He didn't come fast enough. I didn't want to 'cuss' him, or anything of that kind.

Q. ''The question asked you was whether or not this man Lemon appeared to be a competent man to handle that crane in doing that work?

A. "No, sir. Looked like a man that would take fits.

Q. "Now explain to the jury, if you know, what movement the crane man should have made with that crane when it was in the position that it was in just before Rosche was hurt; what movement should he have made with it, if you know?

· A. "Look down and see that everything is clear before he raises it and pours the juice into it; I mean the electricity. He should have looked down and took a look at it and see that everything was clear; when these hooks were on the north side of the crane he moved it straight up; he should have given it a little gig ahead away from the girder, and he didn't do it; he pulled it over on top of the man.

"With reference to Lemon, the man that was operating that crane, I came across the bay with twelve bolsters, say they weighed 480 pounds, or a little bit better, and the same crane, only a hump back with it, block to block, and just when I was going across, about that far away from me, down she come, and I turned around to this assistant superintendent, and says, 'That's a hell of a pile of crane men you got.' 'Best we got.' The man that was hurt gave the signal to raise. The crane man didn't gig the carriers ahead; he simply pulled it over. The crane man lifted over on top of the man after he got that signal. According to the way I seen it, Rosche did not have hold of the hooks at the time he gave the signal. The way I saw, the hooks were not hanging clear; one hook was fast. Lemon was not a competent crane man; he was incompetent in a hundred ways. I didn't have any trouble with Lemon. I called him down and told him what I wanted him to do; told him to be careful. I called him down because sometimes he would pour the juice into it and it lifted it right straight up and the hooks would slip, and his brains wasn't on it; he didn't use judgment where he was going to land it; he couldn't put it down where I wanted it, the load, that was the trouble. After I educated him, I thought he was going to make a good crane man, after I talked to him and told him how to do these things he did better."

Larue, testifying as a witness for defendant, says that he is chief electrician at defendant's works and has full say over all the cranes and crane men and had about forty men under him and twenty-two cranes; did not have charge of those cranes in the foundry; didn't have anything to do with them.  He says further:

"Lemon was employed by the employment office and sent to me and I put him to work as a crane student.  He is supposed to stay there two weeks as crane student.  The crane student, no matter how thick headed he may be, is a crane student really just two weeks, and after two weeks have expired he is a crane man.  He has got to serve seventy days work at seventeen cents an hour.  He works two weeks as a crane student and the rest of the time he has got to put in as a crane man until the seventy days is up.  We require a crane man to work for the balance of the seventy days, except the two weeks, at a student's wage, when he is really a crane man.  Before putting crane men to work the only thing I tell them is about the principal parts of the crane, that is, I tell them about carrying loads, not to get them too high and not to carry them over the men's head.  I told Lemon to work slow; it is safer.

Q. "The only instruction you gave Lemon was to work slowly, was it?

A. "I told him about the different parts of the crane. I did not take him up into the crane and show him the levers. I told him about these levers, about the work with the crane.

"I observed Lemon's work in operating a crane by himself.  He was a competent and careful crane man.  The crane man has to tend to business and watch what he is doing.  It is his duty to watch what he is doing and where he is going and to pay attention to the stuff he is handling and the men that are about there and that are doing the work around that crane.  It is his business to watch the man that has charge of the work and get his signals and obey the signals that he gets

from the man in charge of the work. A crane man is not a student for seventy days; he is a student for two weeks and that is all."

Winegar testifies as to instructing Lemon; says that, from his experience and observation of crane students, Lemon appeared to be a competent and careful and a proper man to handle a crane, as far as his experience had gone.

Sparks testifies to substantially the same.

There is other evidence on this subject. Some of that stated is qualified to some extent on cross-examination, and some of it is contradicted by witnesses for defendant. From the evidence we have set out, it will be seen that, among other things bearing on the question as to the competency of Lemon, there is evidence that prior to the accident in question there was a disposition on the part of Lemon to refuse to obey orders, and the jury could have found that he did refuse to obey the foreman's signal to move the crane and hooks north and away from the girder before raising the hooks. Under the authorities, this is a proper circumstance to be taken into account.

2,4. MASTER AND SERVANT: incompetent fellow servant: evidence to show: disobedience to orders: negligence.

2. The court instructed the jury that if deceased was guilty of contributory negligence, plaintiff could not recover. Defendant offered an instruction to the effect that if Lemon raised his tackle in obedience to a signal given by Rosche, and the hooks attached to the tackle, while being so hoisted, caught the girder and tipped it over, the jury must find for the defendant. This was refused. There was a conflict in the testimony as to whether Rosche did give such a signal. But, under the circumstances shown, we are of opinion that, even had he done so, it would not have been negligent as a matter of law, but that it was still a question for the jury. It does not appear whether deceased saw Burr give Lemon the signal to move the crane north and away from the girder, but deceased and Burr were standing close together at the time such signal

5. MASTER AND SERVANT: contributory negligence.

was given, and it further appears from the testimony that it was the duty of the crane man to move the crane and hooks away from the girder before raising them. If Lemon had obeyed Burr's signal, or had performed his duty in moving the hooks north, then the giving of the signal by Rosche, if he did so, to raise the hooks would not have been negligent.

Without again referring to the testimony, we are of opinion that it was a question for the jury to determine whether the alleged incompetency of Lemon was the proximate cause of the injury to the deceased. Ordinarily it is so. *Bruns v. Co.*, 152 Iowa 61, 68; *Fitter v. Co.*, 143 Iowa 689, 692.

6. MASTER AND
SERVANT:
proximate
cause: jury
question.

The connection between Lemon's incompetency, whether from disposition to refuse to obey foreman Burr, from ignorance of the danger of tipping a girder and the proper method of avoiding such danger, or from ignorance of what would be a proper signal under such circumstances, is a matter properly to be considered by the jury, and from these matters the inference could be drawn by the jury, if they saw fit, that the injury was caused by the incompetence of Lemon, if the jury should so find that he was incompetent. Other matters of minor importance have been suggested in argument, but we have noticed the points most strongly urged. For the reasons given, we are of opinion that the order granting a new trial ought to be, and it is—*Affirmed.*

DEEMER, C. J., WEAVER and GAYNOR and LADD, JJ., concur.